# KAUL v BCBS

## K11-11

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

RICHARD ARJUN KAUL, MD

Plaintiff

v.

HORIZON BLUE CROSS BLUE SHIELD
ROBERT A. MARINO

Defendants

_____

CIVIL ACTION: NO.:

COMPLAINT

2

## Parties

## Plaintiff

RICHARD ARJUN KAUL, MD **("Kaul")** – 24 Washington Valley Road, Morristown, NJ 07960: 973 876 2877
DRRICHARDKAUL@GMAIL.COM

## Defendants

1. Horizon Blue Cross Blue Shield of New Jersey **("BCBS")** – 3 Penn Plaza East, Newark, NJ 07105
2. Robert A. Marino **("Marino")** – 1 Liberty Plaza, Suite 1300, New York, NY 10006

# Jurisdiction + Venue

## Jurisdiction:

General:

28 U.S.C. § 1331 – Kaul's allegations arise pursuant to Section 1983 claims of violations of Kaul's Constitutional rights and U.S.C. § 1964(a)(b)(c)(d) and 1962.

U.S.C. § 337 – Kaul's alleges violations of an Act of Congress regulating commerce and monopolies.

28 U.S.C. § 1332 – 28 U.S.C. § 1332(d)(2)(A) – Kaul is a citizen of a different state to certain Defendants and the aggregate amount in controversy exceeds seventy-five thousand dollars ($75,000).

Personal:

The Court has personal jurisdiction over all Defendants, as each Defendant has transacted business, maintained substantial contacts, and/or committed acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States including this District. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to a court of general jurisdiction in New Jersey.

## Venue:

28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located and (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## Preliminary Statement

1. Plaintiff RICHARD ARJUN KAUL (**"Kaul"**) brings this case (K11-11) against Defendants Horizon Blue Cross Blue Shield and its ex-CEO, Robert A. Marino (employed with Empire BCBS New York since 2017) on charges of having perpetrated and continuing to perpetrate, amongst other things, massive nationwide schemes of racketeering, anti-trust infractions and civil rights violations, in which they have targeted and continue to target principally ethnic minority physicians (Indians, African-Americans, Hispanics), to whom they owe money and whom they victimize, in collusion/conspiracy with state/federal agencies, by causing the illegal revocation of their medical licenses, the incarceration of their person and the illegal seizure of their assets.

2. The Defendants perpetrated such a scheme against Kaul, and it was not until December 2022, that evidence emerged of this scheme and it did so through two related cases, one a civil matter pending in the Eastern District of Pennsylvania (Anand v Independence Blue Cross: 20-cv-06246) and the other a criminal matter tried in the Eastern District of Michigan (USA v Leslie Pompy: 18-cr-20454) (**Exhibit 1**) in which Defendant, Dr. Lesly Pompy, was acquitted by a jury of all thirty-eight (38) charges on January 4, 2023 (**Exhibit 2**). This **"new"** evidence did not come into Kaul's possession until recently, and was not available to Kaul nor reasonably could have been, as it remained in the guarded possession of investigators employed by the Defendants and other members of the Blue Cross Blue Shield family.

3. In addition to the emergence of the highly incriminating Pompy-Anand body of evidence, there now exists that over at least the last two (2) decades, the Defendants have submitted knowingly false data to the New Jersey Department of Banking and Insurance in support of their annual applications to increase the public's cost of health insurance premiums, and evidence that this state agency was either willfully blind and or failed to conduct proper due diligence in its verification of the accuracy and truthfulness of the Defendants fraudulent data.

4. K11-11 seeks, amongst other things, to publicly expose the Defendants crimes and cause the State of New Jersey to either investigate and prosecute those responsible for these crimes, but if the State is conflicted, to then have appointed a special prosecutor, in order that the public and ethnic minority physicians be protected from the persecution that would continue if the Defendants are not held criminally liable.

5

## Evidence + Related Cases

**5.** UNITED STATES OF AMERICA v. LESLY POMPY: 18-cr-20454 – UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF MICHIGAN: Dr. Pompy was criminally charged on June 26, 2016, with a thirty-seven (37) count indictment in which he was accused of allegedly having dispensed opiates and other commonly prescribed pain reducing medications on certain dates to approximately fifteen (15) patients in 2016. Dr. Pompy, who had been in practice for over thirty (30) years was the largest provider of pain management services in his county, and had successfully treated tens of thousands of patients. The criminal trial commenced on November 28, 2022, and concluded on January 4, 2023, with an acquittal by the jury on all thirty-seven (37) counts. The trial resulted in the production by a BCBS investigator of testimony highly to the insurance company's **"ongoing pattern of racketeering",** in which with it, with its state-co-conspirators, has perpetrated through and under state-cover hundreds of RICO predicate acts, that include wire fraud/entrapment/evidence tampering/falsification medical records/issuance of fraudulent of state driving licenses by state police/subornation re production of fraudulent medical documents by physician employees of Defendant BCBS/formalization and education at special undercover training units for BCBS investigators of tactics of entrapment and their subsequent propagation against physicians.

On December 2/3, 2022, testimony was provided by Mr. James Stewart Howell, a person who after having retired from the police force, was hired and trained by BCBS to conduct undercover operations, targeting principally ethnic minority/foreign trained physicians whom BCBS wanted eliminated (license revocation/incarceration/suicide/death) in order to eradicate their debt to the physician, and eliminate the competitive threat posed by their continued practice in the relevant healthcare market.

Excerpts of Mr. Howell's testimony are included below, and the entire two (2) day transcript is enclosed (**Exhibit 3** December 1, 2022 – Direct Examination) (**Exhibit 4** December 2, 2022 – Direct + Cross Examination):

### Conspiracy to commit fraud
BY MR. CHAPMAN – Page 99 Line 11-25 (Howell defense cross examination) (**Exhibit 4**):
Q. All right. So, let's start with January 5th. Your goal is to go into Dr. Pompy's office and see if you can get seen? A. Yes, sir.
Q. You were told by the front desk that you need to have a referral for pain management? A. That's correct.
Q. You go to Blue Cross Blue Shield and say, "He won't see me without a referral," right? A. Right.
Q. They set you up with Dr. Robertson?
A. Yeah.
Q. Now, you understand how the referral system of medicine works, right? Doctors refer patients to other doctors when they're not able to help that specific issue?
A. It -- I -- yeah, I understand the basic sense of that, but ...

6

**Evidential Falsification/Tampering with medical records/Wire fraud**

BY MR. CHAPMAN - Page 101 Lines 1-25 + Page 102 Lines 1-25 + Page 3 Lines 1-17 (Howell defense cross examination) (**Exhibit 4**):

MR. CHAPMAN –Government Exhibit on page 7, Government Exhibit 1, page 7?

MS. OUELETTE: Is that page 7?

MR. CHAPMAN: Yes, please.

BY MR. CHAPMAN:

Q So I think you were correct that the – the other documents said back and nerve problems, but here we have a prescription, right?

A. Yes.

Q. And this is from Dr. Robertson?

A. It is, yes.

Q. And it says for pain management, right?

A. Yep, it just says the words "pain management."

Q. And that's Dr. Robertson's signature?

A. Yes.

Q. Now, that was dated December 10th, 2015, correct?

A. It was.

Q. You had Dr. Robertson backdate this referral to make it look like it was made before you showed up on January 5th?

A. I -- I don't recall the -- the timeline of that being signed or dated.

Q. Mr. Howell, there must have been some discussion about this. This is a medical record, right?

A. It is.

Q. You're aware that falsification of a medical record is a felony in the State of Michigan?

A. It is, yeah.

Q. Did you have any special authorization to commit a felony in the State of Michigan, to create that false medical record?

A. No, my intent was -- no intent to commit a felony. My intent was to further the investigation and get a pain management referral. There was no --

Q. The question was did you have any special permission to commit a felony in the State of Michigan and alter a medical record?

A. I – I didn't alter that document.

Q. You had Dr. Robertson do that, right?

A. He wrote that pain management referral. I didn't write it.

Q. Was your conversation with Dr. Robertson to receive pain management on December 5th or was it after January -- on December 10th or was it after January 5th?

A. It was after January 5th.

Q. That date's false?

A. That date's false. I talked to him after January 5th, 2016.

Q. The need for pain management is also false?

A. Right.

Q. Okay.

A. It's -- yeah.

Q. Did you talk to any health care professionals about whether getting a referral for pain management would give a doctor an indication that you have a legitimate medical injury?

A. No. Just I talked to Dr. Robertson about this referral. It's -- didn't go anywhere else.

Q. Did you talk to Blue Cross Blue Shield about this referral?

A. I think my manager knew I did this, yeah.

Q. Your manager said it was, okay?

A. Yeah.

Q. Did you have Dr. Robertson date that referral on December 10th or did he just do that himself?

A. I don't remember any discussion about what the date was. Q. So it just magically happened to be backdated to before you ever stepped foot in Dr. Pompy's office?

A. I didn't say that.

Q. Okay.

### Evidential Falsification/Tampering with medical records/Wire fraud/Entrapment/Conspiracy to commit fraud

BY MR. CHAPMAN - Page 143 Line 7-20 + Page 144 Line 1-25 (Howell defense cross examination) (**Exhibit 4**):

Q. In fact, during the entire time you saw Dr. Pompy, there are many of those tests that you didn't complete?

A. Many of them that I did not do, that's correct.

Q. You informed his office staff that insurance wouldn't cover it?

A. The discussion about what was not covered was in regard to an MRI, which is expensive.

Q. Was it true that Blue Cross Blue Shield wouldn't cover the test that was ordered by Dr. Pompy?

A. I don't know if it would have been or not. I didn't discuss it with anyone really.

Q. Just like you did with the X-ray, you had the ability to go to Dr. Robertson and falsify another MRI study, right?

A. I -- sure, I guess I could have ...

A. He would have probably assisted like he did on the other one.

Q. Because he's willing to falsify medical records for you, right?

A. He's willing to assist me.

Q. Okay. But you didn't do that, you didn't present a normal MRI. You said, "My insurance won't cover it."

A. I did, yep.

Q. Because you were concerned that if you came into that office with a normal MRI, Dr. Pompy would say, "I don't see anything wrong with you."

A. Yeah, I just did not want to -- didn't want to get an MRI and bring it in there or falsify one.

Q. Then that's the end of the operation, right?

A. I don't --

Q. You don't get your man?

8

A. I don't think so.

Q. Okay. Same thing with the referral. You don't falsify that referral to get into Dr. Pompy's office, that's the end of the operation?

A. Yeah, if you didn't come up with a pain management referral, I don't think they would accept you there.

Q. The only reason you got treated by Dr. Pompy was because you were willing to go so far as to falsify medical records to get in?

### Evidential falsification/Diversion drugs by undercover agent

BY MR. CHAPMAN - Page 157 Line 17-25 + Page 158 Line 1-25 + Page 159 Line 1-25 + Page 160 Line 1-25 + Page 161 Line 1-7 (Howell defense cross examination) (**Exhibit 4**):

Q. Now, during that April 26th visit, you also tested positive in a point of care cup for benzodiazepines, isn't that, right?

A. I don't think that's right. I don't think there was a point of care test.

MR. CHAPMAN: Can we take a look at Government's 1, page 59? Can you blow up the box where it says

"Benzodiazepines"?

BY MR. CHAPMAN:

Q. You see a positive for benzodiazepine, sir?

A. I see that.

Q. Okay. And this is an indication that the point of care cup that you dropped a sample in showed positive for benzodiazepines?

A. If you could back that out so I can see -- I don't -- I don't recall that saying point of care above that.

Q. We can do that.

You're aware from reviewing these tests that if there's a confirmation study, usually it shows the metabolite levels in the urine?

A. I have seen that, yes.

Q. And if it's a point of care cup, it's usually filled out by hand?

A. Usually, yeah, 'cuz it's done on the spot.

Q. Somebody's trying to interpret that test?

A. Right.

Q. And you're aware from your knowledge as an investigator that these point of care cups can be very inaccurate?

A. I can't really talk about the accuracy of those. I -- I don't know the -- the total -- the accuracy of them.

Q. After you had a positive test for barbiturates and also benzodiazepines, did you think that these tests are accurate?

A. Those particular ones are not, no.

Q. Okay. So, in your experience there's inaccuracies?

A. Oh -- on -- yeah, on this case for sure there's inaccuracies.

Q. You also went over --

MR. CHAPMAN: And we can take that down. Thank you. BY MR. CHAPMAN:

9

Q. -- a positive barbiturate test from your urine sample, I believe it was from March 22nd, right?

A. That's correct.

Q. And you were informed of those results on April 26th?

A. That's right.

Q. Over a month later?

A. Yes.

Q. Okay. At that point you hadn't received any medications from Dr. Pompy?

A. Right. At the time they were discussing the results of the test I had not been prescribed any medication.

Q. So --

A. Is that what you're asking?

Q. Yes.

A. Okay.

Q. I don't mean to be redundant, but you dropped a sample on March 22nd, you learn of the results on April 26th?

A. That's correct, yes.

Q. You also mentioned that at that time, within 48 hours you went to Blue Cross and got your own test done?

A. I did.

Q. Had you taken a barbiturate, that would have been long gone from your system a month later, right?

A. I don't know.

Q. I imagine the positive test caused quite a stir at Blue Cross Blue Shield?

A. I -- it had me pretty upset but I don't know about causing a stir. I -- I definitely thought it was important to address it immediately.

Q. Without going over the whole thing, that same day, 4-26-26, you filled out a pre-visit questionnaire?

A. Yes.

Q. You again said your pain began ten years ago?

A. I believe so, yes.

Q. You said it was a level 5?

A. Yes.

Q. You said it stayed the same and is continuous?

A. Yeah. I kept indicating stiffness and circling 5s and continuous and --

Q. You said it was -- I'm sorry I cut you off. You said it was worse in the morning?

A. Yeah.

Q. You said you were using physical therapy to cope?

A. Yes.

Q. You did not indicate any other new symptoms?

A. Correct.

Q. And then you also indicated that you were taking Xanax at that time, right?

A. I did, yes.

Q. But that was a false statement because you weren't prescribed any Xanax?

A. That's true.

10

**Conspiracy to entrap and illegal concealment/non-contractual disclosure from public of health premium fund diversion to 'Blues Academy'**
BY MR. LIEVENSE – Page 8 Line 3-25 (Howell direct examination) (**Exhibit 3**):

Q. And what type of in-house training did they provide you? A. We did a training as far as we did a -- like a -- we called it a Blues Academy which -- which covered an entire range of health care investigations.  We talked about undercover activities and things like that.
Q. Did you also have to learn how to become familiar with like Blue Cross Blue Shield data and information?
A. Yes.
Q. At some point did you become an accredited health care fraud investigator?
A. Yes.
Q. Is that a program -- was that a program kind of outside of Blue Cross training?
A. Yes.
Q. And what -- what -- what did that training entail?
A. That is -- to be an accredited health care fraud investigator, you had to be a member of the NHCAA, which is National Health Care Antifraud Association, and then you have to have five years' experience doing health care investigations, and then you also had to pass 150-question test to be -- to get that certification.


**Conspiracy with state to commit fraud/issue fraudulent official documents**
BY MR. LIEVENSE – Page 14 Line 11-25 (Howell direct examination) (**Exhibit 3**):

Q. Now, do you use your normal driver's license that's issued by the Secretary of State that you've had since you turned 16 years old?
A. No.
Q. All right. Do you -- are you able to get an undercover driver's license?
A. Yes.
Q. Now, how do you go about getting one of those?
A. There's a process we go through. I would -- I submit it to my manager and then it goes to the Michigan State Police, from there to the Secretary of State of Michigan.
Q. And so when you want to get an undercover driver's license, do you have to go to a special location, or do you just go to the local Secretary of State?
A. Both …


**Conspiracy with state to commit fraud/issue fraudulent official documents**
BY MR. LIEVENSE – Page 16 Line 4-15 (Howell direct examination) (**Exhibit 3**):

Q. And would you need an insurance card that matched your undercover driver's license?
A. Yes.
Q. And so once you received an undercover driver's license from the State of Michigan, what would you need to do to get an undercover insurance card?

A. Submit -- submit a form under that same name to someone who reviews it and then they actually get a physical, actual plastic card made.

Q. And why do you use an undercover driver's license and undercover Blue Cross Blue Shield insurance card instead of your personal ones?

## Conspiracy with state in furtherance of schemes of fraud and entrapment/unaccounted for diversion of prescription drugs

BY MR. LIEVENSE – Page 45 Line 7-23 (Howell direct examination) (**Exhibit 4**):

Q. Like to show you Government's Exhibit 1A.

After you received the prescription from Dr. Pompy on April -- the two prescriptions on April -- well, the Norco and the Lyrica prescriptions on April 26th, what did you do with them?

A. I went and filled them, and I was with the Michigan State Police and turned them over to them.

Q. So you first went to a pharmacy?

A. That's correct.

Q. And you filled the prescription?

A. Yep.

Q. And then once you got the prescription and the pills, what did you do?

A. Turned them over to them immediately, had them count them just to make sure.

Q. By them, you said it was the Michigan State Police?

A. Yes.

6. NEIL ANAND v. INDEPENDENCE BLUE CROSS: 20-cv-062456 – UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA: Dr. Neil Anand, an Indian origin Pennsylvania based interventional pain physician, who established a highly successful interventional pain practice, was indicted by the US Government in 2019, on almost exactly the same charges as those levied against Dr. Pompy and many other ethnic minority physicians. In these cases, there is either no evidence or fraudulent 'evidence', and most charged physicians plead guilty, even though they know they are not guilty, but they are unable to fund a defense, as their assets are illegally seized. Dr. Anand attended D. Pompy's trial on every day. In late 2020, Dr. Anand, having calculated that Defendant Independence BCBS had conspired with state/federal investigative/prosecutorial/adjudicative agencies to manufacture the indictment against him, did then initiate a civil suit against BCBS. However, his efforts to prosecute the case and procure further evidence was obstructed by Defendant BCBS, and the case was eventually dismissed. Dr. Anand appealed to the Third Circuit Court of Appeals, and on June 29, 2021, the Appellate Court remanded the case to the district court (**Exhibit 5**). Consequent to the January 4, 2023, widely publicized acquittal of Dr. Pompy, the district court in Dr. Anand's case dismissed Defendant Independent BCBS's motion to dismiss, and ordered it to answer the claims (**Exhibit 6**). The lower court's decision was also based on argument/fact/law submitted by Dr. Anand in his January 4, 2023, responsive brief to Defendant motion to dismiss (**Exhibit 7**), in which he submits binding case law, in which the United States District Court has conclusively found that BCBS is a recalcitrant and chronic antitrust violator. BCBS's **"patterns"** of ongoing misconduct commenced against Kaul in 2005/2006, but were concealed from Kaul until

recently, who only came into their possession as a consequence of Dr. Anand's extensive state/federal Freedom of Information (FOI) requests in 2022 that exposed the Defendants' so called 'Health Fraud Partnership'. Dr. Anand's evidence was conclusively corroborated during Dr. Pompy's trial and acquittal. A jury of twelve (12) people believed that there does indeed exist a **"vast conspiracy"** between government agencies and private/corporate interests, that targets successful ethnic minority physicians. The referenced section of Anand's January 4, 2023, submission is:

"<ins>Plaintiff [ANAND] Has A Valid Sherman and Clayton Act Anti-trust Claim</ins>.

**The monopolistic and price fixing activity of the Blue Cross Blue Shield Companies is of common public awareness due to its recent antitrust settlement, arising from a class action antitrust lawsuit called In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406, which was reached on behalf of individuals and companies that purchased or received health insurance provided or administered by a Blue Cross Blue Shield company. The Class Representatives reached a Settlement on October 16, 2020, with the Blue Cross Blue Shield Association and settling Individual Blue Plans that knowingly violated antitrust laws by entering into an agreement not to compete with each other and to limit competition among themselves in selling health insurance and administrative services for health insurance. See https://www.bcbssettlement.com/. <ins>Pursuant to collateral estoppel, the restraint of trade by Blue Cross Blue Shield Association and its franchisees has been determined under In re Blue Cross Blue Shield Antitrust Litig., FINAL ORDER, Master File No.: 2:13-CV-20000-RDP (MDL NO.: 2406) (N.D. Ala. 2018).  The FINAL ORDER provides on Pages 1-2: "This litigation began more than nine years ago and involves the consolidation of a number of actions filed by Subscriber Plaintiffs against the Blue Cross and Blue Shield Association ("BCBSA") and its Member Plans (the "Member Plans" or "Blue Plans") (collectively, "Defendants" or "Blues"). Subscriber Plaintiffs allege, among other things, that Defendants violated Sections 1, 2, and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-3, by entering into an unlawful agreement that restrained competition between them in the markets for selling health insurance and the administration of Commercial Health Benefit Products in the United States and its territories. Subscriber Plaintiffs contend that the Blues: (1) allocated geographic territories; (2) limited the Member Plans from competing against each other, even when not using a Blue name, by mandating a minimum percentage of business that each Member Plan must do under that name, both inside and outside each Member Plan's territory; (3) restricted the right of any Member Plan to be sold to a company that is not a member of BCBSA; and (4) further agreed to other ancillary restraints on competition. (Doc. # 1082).</ins>**

**IBC is utilizing its monopoly market power to increase insurance premium prices and deductibles for its Members negatively.  IBC and its "most favored" groups of health providers through Facilitated Health Networks (FHN), engage in anticompetitive conducts, i.e. price fixing, geographic market division, and group boycott (attack of non-white physicians prescribing controlled substances) which are causing market injury to individual physicians and small groups and are illegal per se. IBC in their own public announcements claim they are the largest and leading health insurer in Philadelphia (supported by USDOJ findings supra), and is utilizing its monopsony market power by substantially controlling physician treatment plans and reducing physician fee schedules, as IBC is the major purchaser of health services**

13

offered by Philadelphia physicians. The per se rule is violated here, "by a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, experience, training, or willingness to employ innovative and difficult procedures in individual cases. Such a restraint may also discourage entry into the market, and may deter experimentation and new developments by individual entrepreneurs". quoting P.457 U. S. 348 Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332 (1982); and Group Life & Health Ins. Co. v. Royal Drug Co., Inc., 440 U.S. 205 (1979). Anand's Complaint's Claims, distinguishes between "restraints with an anticompetitive"

In this case, K11-11, the question of whether the Defendants can raise any defenses to Kaul's antitrust claims has been affirmatively answered in In re Blue Cross Blue Shield Antitrust Litig., FINAL ORDER, Master File No.: 2:13-CV-20000-RDP (MDL NO.: 2406) (N.D. Ala. 2018), and it is no; the law has foreclosed the Defendants, and thus the law permits Kaul to move for Summary Judgment.

Dr. Anand's September 9, 2021, 3rd Amended Complaint painstakingly details the method, that has been, and continues to be uniformly utilized across the country by BCBS against principally ethnic minority physicians, in what is effectively a bureaucratic scheme of 'slave-like' labor and ethnic cleansing, perpetrated through the American courts and jails (**Exhibit 8**):

"IBC and its employees engaged in racial discrimination against Anand and other Philadelphia and Pennsylvania physicians because of their race, heritage, skin color or religion"

"to its recent antitrust settlement, arising from a class action antitrust lawsuit called In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406, N.D. Ala. Master File No. 2:13-cv-20000-RDP, which was reached on behalf of individuals and companies that purchased or received health insurance provided or administered by a Blue Cross Blue Shield company."

"IBC uses its "police power" via the Health Care Fraud Prevention Partnership to induce criminal proceedings against other physicians through coordination with OIG, FBI, and USDOJ which causes a chilling effect of proper medical treatments of patients."

7. ANAND STATE/FEDERAL FOI REQUESTS: In a period commencing in or around late early 2021, Dr. Anand began submitting FOI requests to state/federal governmental agencies, that sought, amongst other things, any and all information pertaining/relevant to any agreements/contracts/communications between the insurance industry and the government regarding conspiracies as to what Dr. Anand was ultimately able to establish as the so called "Health Fraud Partnership". This illegal agreement, is misleadingly titled, in order to provide 'cover' and apparent legitimacy for an illegal scheme concocted by the insurance industry, in which governmental agencies have provided it unfettered access and control of governmental investigative/prosecutorial/adjudicative functions with which they have manufactured knowingly false civil/criminal cases against principally ethnic minority physicians, for license revocation/asset seizure/incarceration, in order to eradicate their debit and eliminate the future threat of competition that the physician's continued practice would pose. Within the

extensive volumes of highly incriminating evidence received by Dr. Anand, are two (2) affidavits from the Office of the Pennsylvania AG (May 20, 2022/November 3, 2022), in which there is an effective admission that the insurance industry acts in conspiracy with the state in the aforementioned manner (**Exhibits 9 + 10**):

**"In that specific case, although an initial referral was received from an Independence Company regarding Dr. Bloom and his chiropractic office … After receiving the referral, from Independence Blue Cross, the Insurance Fraud Section opened an investigation into the allegations and after the investigation was completed, both Dr. Bloom and Weathervane were charged and prosecuted for the following crimes**
**a.      Insurance Fraud 18 P.C.S.A. §4117 (a)(2)(3) and**
**b.      Theft by Deception 18 Pa.C.S.A. §3922 (a)."**

**"The IFS [Insurance Fraud Section of PAOAG] was able to readily identify three investigations that fit the parameters [Referral from BCBS] of Mr. Anand's request. All three investigations were conducted before the Grand Jury and clean slate/limited access provisions of CHRIA are applicable to criminal cases filed as a result of all three investigations."**

# Chronology of Relevant Fact

8. In a period from approximately 2004 to 2012, Kaul provided interventional pain and minimally invasive spine surgery care to thousands of patients with healthcare policies provided by Defendant BCBS.

9. The care provided to these patients was clinically indicated, and based on the patients' history, physical examination, and diagnostic studies, and was purposed to, and did in fact, reduce the patients' pain disability. These facts were supported in the documentation within the patient's clinical file.

10. Kaul submitted invoices to Defendant BCBS for payment of these services, and in over ninety (90%) of these pre-certified points of care, Defendant BCBS fraudulently refused payment, in order to increase compensation to their corporate executives and bribes to corrupted politicians/judges on their 'payroll'.

11. The approximate amounts of unpaid fees were not less than seven million dollars ($7,000,000), and in the period from 2004 to 2012, Kaul became obligated to file suit on two (2) occasions against Defendant BCBS.

12. In retaliation, Defendant BCBS, in collusion/conspiracy with **The Kaul Cases** Defendants coopted, within the State of New Jersey, both state/federal investigative/prosecutorial/judicial agencies to have Kaul's physician license revoked and to attempt to have him indicted and incarcerated, according to the rules of their 'Elimination Scheme' final-solution-esque manifesto.

(The insurance industry was born in London in the 1600s on the back of the British trans-Atlantic slaving industry, through Lloyd's of London, an insurance conglomerate that today ultimately underwrites every insurance policy, and that has since its ignominious beginnings profited from human suffering, including that associated with the Nazi Holocaust. As a consequence of Kaul's persistence within **The Kaul Cases** of exposing the American insurance industry's connection to Lloyd's dark slaving profiteering (**Exhibit 1**) this British corporation did, for the first time in its history, and unquestionably in a public relations 'damage-mitigation' effort, did publicly admit to these crimes against humanity: https://www.lloyds.com/about-lloyds/history/the-trans-atlantic-slave-trade/lloyds-marine-insurance-and-slavery. The insurance industry, which includes the Defendants, has replaced shipping slaves with the human trafficking of Indian/African American physicians into the modern-day planation equivalent, that of the American jails.)

13. In a period from approximately 2012 to 2016, Kaul, after having had his license illegally revoked in 2014, continued to be subjected to state/federal criminal investigations, orchestrated/conducted by Defendant BCBS in collusion/conspiracy with **The Kaul Cases**

16

Defendants. None of these investigations produced any evidence of wrongdoing, the lack of which undermines the entirety of the case that caused the illegal revocation of Kaul's license.

14. From February 22, 2016, to August 19, 2021, Kaul filed suit in the United States District Court, against the individuals and corporations that had conspired to commit and did commit a **"pattern of racketeering"** against Kaul.

15. On June 17, 2013, consequent to the suspension of Kaul's license, highly defamatory press coverage and Defendant BCBS's scheme to refuse to pay Kaul's invoices, Kaul's corporations became obligated to file for Chapter 11 bankruptcy, a case in which Defendant BCBS was identified as a debtor.

16. During the bankruptcy proceedings, the trustee and his lawyer, the latter, Daniel Stolz, Esq, a Defendant in **The Kaul Cases**, conspired with insurance carriers to not file claims to collect the monies owed to Kaul's estate by these entities, in return for which Defendant Stolz received bribes, disguised as 'legal fees' (**Exhibit 11**).

17. Upon information recently provided to Kaul, he now asserts that Defendant BCBS conspired with Defendant Stolz in the scheme to not collect monies owed to Kaul's estate, as part of the quid pro quo scheme in which Defendant Stolz received bribes from Defendant BCBS, disguised as 'legal fees'.

18. In approximately 2019, Kaul was contacted by a Dr. Neil Anand, a physician of Indian origin, who had recently been indicted by the federal government on charges of healthcare fraud. In late 2020 Kaul suggested Anand seek legal redress against the insurance carrier that owed him the most money, as this entity was likely the instigator of the indictment.

19. On December 11, 2020, Anand initiated suit against Independence Blue Cross, the Pennsylvania subsidiary of the Blue Cross Blue Shield corporate collective.

20. On September 27, 2022, Anand filed a 'Third Amended Complaint' (D.E. 57), in which he details the scheme perpetrated by BCBS, that involved, amongst other things, the use of the US wires to transmit knowingly fraudulent information in furtherance of its scheme to destroy Anand 's career and have him indicted and incarcerated.

21. In 2018, Dr. Lesly Pompy, a Michigan based interventional pain physician of Haitian origin, was indicted by the US Government on charges of healthcare fraud, in a case almost identical to that filed against Dr. Anand.

22. Dr. Pompy, upon being indicted, did initially consider pleading guilty, as he believed, that despite his innocence, it would be impossible to successfully contest the case. However, he was persuaded by Dr. Anand to **"fight"** the charges.

17

23. The criminal trial of Dr. Pompy commenced on November 28, 2022, and concluded on January 4, 2023, with the jury acquitting him on all thirty-seven (37) charges.

24. However, during the trial evidence emerged of the fraudulent schemes perpetrated by the Blue Cross Blue Shield corporations in their efforts to entrap knowingly innocent physicians, mostly of whom belonged to ethnic minorities.

25. During the testimony of a James Howell, an ex-police officer employed by Blue Cross Blue Shield to manufacture entrapment schemes, Howell testified that in furtherance of these schemes he was provided fraudulent medical documents, driving licenses and other official documents by agencies/persons of the State of Michigan and physicians employed by Blue Cross Blue Shield.

26. Howell's prior testimony in various other prior court proceedings had resulted in the wrongful conviction and incarceration of other ethnic minority physicians, all of whom continue to languish in jail.

27. The trial of Dr. Pompy unequivocally establishes the **"pattern of racketeering"** being perpetrated by the American insurance industry and specifically the Blue Cross Blue Shield corporations, and corroborates the claims that Kaul has asserted within **The Kaul Cases**, since 2016.

28. Dr. Pompy's widely publicized verdict was announced on January 4, 2023, and on January 6, 2023, the district judge in Dr. Anand's suit against Independence Blue Cross Blue Shield, entered an order denying the Defendant's motion to dismiss, and ordering it to file answer to Dr. Anand's opposition to their motion.

# Legal Claims

## COUNT ONE
### RICO

Defendants: Robert Marino, BCBS

Co-conspirators: New Jersey Department Banking and Insurance/Office of the New Jersey AG
RICO Predicate Acts: Mail fraud, wire fraud, theft, public corruption
Association-In-Fact Enterprise: "State of New Jersey -BCBS Association-In-Fact Enterprise"

### Overview:

29. In a period commencing approximately 2003/2004, Defendant BCBS commenced conspiring to commit and did commit a fraudulent scheme that targeted Kaul, an Indian physician, with concerted misrepresentations that caused him to provide clinical care to their clients, with the pre-certification promise of renumeration, but to then defraud him of his services by refusing to pay Kaul's invoices, after he had provided the service in good faith. In the perpetration of this scheme, Defendant BCBS, conducted a **"pattern of racketeering"** through the willful and knowingly illegal commission of the RICO predicate acts of wire fraud, mail fraud and theft, in which its corporate officers, including Defendant Marino, converted the State of New Jersey and the BCBS corporation into the **"State of New Jersey-BCBS Association-In-Fact Enterprise" ("NJ-BCBS AIF Enterprise)** through which Defendants Marino/BCBS funneled bribes to multiple New Jersey based politicians, including **The Kaul Cases** Defendant, Christie, who, in exchange for these bribes, abused his executive power to order the state medical board to revoke Kaul's license and commence criminal investigations. The revocation was purposed to eliminate Defendant BCBS's debt to Kaul and the legal liability posed by the lawsuit Kaul filed in February 2012, while the criminal investigations sought to incarcerate Kaul, in order to prevent him from exposing their crimes.

### The "pattern of racketeering":

30. To carry out, or attempt to carry out, the fraudulent scheme, the Defendants, each of whom is associated-in-fact with the **"NJ-BCBS AIF Enterprise"** did knowingly conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

31. Specifically, the Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

32. The multiple acts of racketeering activity which the Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a **"pattern of racketeering activity".** The racketeering activity was and is facilitated by the Defendants' regular use of the state-corporate facilities, services, distribution channels, and employees of the **"NJ-BCBS AIF Enterprise".** The Defendants participated in the fraudulent scheme by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

33. The Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in furtherance of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

34. In devising and executing the illegal scheme, the Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Kaul of the property rights of his reputation, medical license, and healthcare business, by communicating to the public, Kaul's patients, and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud, materially false representations, and would be indicted. For the purpose of executing the illegal scheme, the Defendants committed these RICO predicate acts on hundreds of occasions, with the specific intent to advance the knowingly illegal scheme.

## RICO Predicate Acts

35. Mail Fraud: Defendants Marino/BCBS did, in the relevant period, with knowing illegality conspire to use and did use the US mail to transmit knowingly fraudulent information to Kaul that he would be renumerated for the pre-certified provision of care to patients with health insurance provided by Defendant BCBS. In rendering these representations, Defendants Marino BCBS knew the statements were materially false, and that they had no intention of paying Kaul, consistent with their schemes of theft of service and contractual derogation.

36. Wire Fraud: Defendants Marino/BCBS did, in the relevant period, with knowing illegality conspire to use and did use the US wires to transmit, during phone calls and other digital communications, knowingly fraudulent information to third parties, that included agents of the executive, investigative, prosecutorial, and adjudicative arms of state and federal government, and the knowing fraud was that Kaul had committed health insurance fraud. The purpose of the Defendants scheme was to have Kaul's license revoked, his reputation destroyed, his economic standing destroyed, to have him ostracized, to have him indicted/incarcerated and then to have him either leave the US and or be deported; in order to eradicate their debt to Kaul and to eliminate the competition he presented to their commercial agenda. In the digital and non-digital communications surrounding the scheme, the Defendants discussed with each other and with third party 'state actors' the various tactics that would be used to effectuate

20

the scheme, and these included: **(i)** Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order the medical board revoke Kaul's license and have him indicted; (ii) Use of law and public relation firms to funnel bribes to Christie as part of quid pro quo schemes to revoke Kaul's license, destroy his reputation and cause him to leave the United States; (iii) Use of the US mails and wires to transmit written, telephone, or electronic communications regarding discussions between the Defendants/co-conspirators and state and federal politicians/prosecutors/investigators about the illegal scheme to revoke Kaul's license and have him indicted/incarcerated;**(iv)** Use of US mail and wires to file knowingly false complaints against him with the medical board; **(v)** Use of US mail and wires to send patients letters encouraging them to file frivolous lawsuits against Kaul; **(vi)** Use of the US mail and wires to communicate false information to patients, that he was not qualified to perform minimally invasive spine surgery; **(vii)** Use of the US mail and wires to send false information to personal injury lawyers that Kaul was not qualified to perform minimally invasive spine surgery, had committed insurance fraud, that his accounts receivable could not be collected and that the legal cases had no monetary value; **(vii)** Use of the US mail and wires to send false information to New Jersey politicians, encouraging them, with the promise of political campaign 'donations' to coerce the medical board/state prosecutors to have Kaul's license revoked and have him indicted; **(viii)** Use of the US mail and wires to organize and further schemes to bribe Defendant Christie, in order to have him order Defendant NJBME to revoke Kaul's license; **(ix)** Use of the US mails and wires to transmit letters, emails and other materials indicating that the Defendants co-conspirator lawyers/physicians had been instructed to inform their colleague not to support Kaul in any litigation, in any form, be it financial and or professional; **(x)** Use of the US mails and wires to disseminate written, telephone, or electronic communications regarding the knowingly fraudulent events surrounding the revocation and indictment investigations, in order to ostracize Kaul; **(xi)** Use of the US mails and wires to collect the increased revenues that flowed from the illegal elimination of Kaul from the practice of medicine; **(xii)** Use of the US mail and wires to transmit information in furtherance of their scheme of converting the United States Bankruptcy Court into a racketeering enterprise; **(xiii)** Use of the US mails and wires to transmit false information that Kaul has committed insurance fraud, was not qualified to perform minimally invasive spine surgery, had committed bank fraud and was going to be criminally indicted for Medicare fraud; **(xiv)** + Obstruction of justice and evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2'); **(xv)** Use of the US mail and wires to transmit the illegal consequences of the obstruction of justice/evidence tampering ('The Solomon Critique' + 'The Solomon Critique 2')/indictment investigations to the public, national (state + federal) and international healthcare agencies and regulatory bodies, in furtherance of the defendants scheme to destroy Kaul's reputation globally, his livelihood, his economic standing and prevent him from obtaining a medical license anywhere in the world, or indeed any form of employment.

37. Theft: In a period commencing in or around 2004/2005, Defendants Marino/BCBS did conspire to commit and did commit thousands of separate instances of the RICO predicate act

of theft against Kaul, in which the Defendants knowingly, and with malice aforethought, deceived Kaul into believing he would be paid for the rendering of life-saving care to their pain-ridden clients, but to then refuse to pay/honor the agreement, and to then coerce state/federal investigators/prosecutors to file knowingly false administrative/civil/criminal charges to have Kaul's license revoked and have him incarcerated, and to then use the US wires to propagate these fraudulent charges in order to ostracize/isolate Kaul from any financial/professional support; with the ultimate purpose being to destroy Kaul's economic standing, his reputation, his life and his liberty, in order to advance their economic agenda by eliminating their debt to Kaul and the market competition he presented. The intent and effect of the Defendants scheme, one that is **"ongoing"**, has been to deprive Kaul and many other ethnic minority physicians of their right to a livelihood and life, and to secure their services and effectively enslave them through schemes of false promises/inducements.

38. Public Corruption: In a period commencing in or around 2000, the year in which **The Kaul Cases** Defendant, Christie, was appointed to the office of the US Attorney – DNJ, the Defendants, already entrenched in schemes of political/judicial corruption within the State of New Jersey, did, in collusion/conspiracy with Defendant Christie, convert the office of the US Attorney – DNJ into a **"racketeering enterprise"** in which they engaged in a series of quid pro quo schemes with Defendant Christie, in which they funneled him bribes in exchange for him filing knowingly fraudulent criminal charges of healthcare insurance fraud against cardiologists, most of whom were Indian. Many of these innocent physicians were jailed, bankrupted and or committed suicide. The Defendants profited by eliminating their debt to these physicians and eradicating the threat to the interventional cardiac market of their business competition, thus increasing, albeit fraudulently, corporate and shareholder compensation.

### Description of the "State of New Jersey - BCBS Association-In-Fact Enterprise":

39. RICO defines an enterprise as **"any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."** 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features **(1)** a purpose; **(2)** relationships among those associated with the enterprise; and **(3)** longevity sufficient to permit those associates to pursue the enterprise's purpose.

40. The Defendants have, through the increased revenue generated through their decades old scheme of kickbacks and bribery, increased their control of the state government, its agencies, its legislature, and certain members of its judiciary. The Defendants have perpetrated this scheme through the **"NJ-BCBS AIF Enterprise"**, a criminal scheme that is **"ongoing"** and one that continues to funnel its criminal proceeds into the New York State Exchange. It was with this scheme and through this enterprise, that the Defendants exerted illegal control over the mechanism of physician regulation, a control they used to illegally revoke not only Kaul's medical license, but that of other physicians, in order to eliminate their debt and eradicate the competitive threats posed by Kaul and other physicians.

41. The elements of the **"NJ-BCBS AIF Enterprise"** consist of:

(i) the persons – the Defendants/**The Kaul Cases** co-conspirators/agencies and persons associated and or employed by the State of New Jersey/persons associated and or employed by Defendant BCBS; **(ii)** the motives – the elimination of debt and competition for the finite insurance premium 'pool'/procurement of increased political power and control of government **(iii)** the mechanics and method – the structure is hierarchical in nature, in that the corporate Defendants, consequent to their financial superiority, are situated at the 'top' of the power pyramid, and issue orders/effectuate bribery related control to and of the subjugate public servants within the executive/judicial/legislative branches of government. Defendant Christie, an individual who had complete control of state/federal functions, provided the **"NJ-BCBS AIF Enterprise"** with the use of state/federal agencies and personnel necessary to revoke the Plaintiff's license and have him indicted. Defendant Christie provided these services in return for bribes and monies disguised as 'campaign donations'. The monies were part of a quid pro quo scheme, not protected by Noerr-Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license and potential indictment. Central to the scheme and operation of the **"NJ-BCBS AIF Enterprise"**, is the fact that the Defendants each affirmatively misrepresented or concealed from their shareholders and the public, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke Kaul's license and have him, and other ethnic minority physicians wrongfully indicted. The Defendants understood that if their shareholders had become aware of the scheme, they would have passed a vote against it, realizing the liability it would incur. The Defendants understood that if the public became aware of the illegal use of the public's taxes to fund their illegal scheme of revocation/indictment they would have demanded an investigation and not voted for Defendant Christie in the 2013 New Jersey Gubenatorial election. Specifically, the Defendants claimed that the bribes paid were intended to assist them in their legislative efforts, when in fact they were quid pro quo payments to Defendant Christie, in order to have Kaul's license revoked and attempt to have him indicted.

**(iv)** the distinctness – at all relevant times, including the present, the **"NJ-BCBS AIF Enterprise"** had an existence separate and distinct from each of the Defendants, and was separate and distinct from the **"pattern of racketeering"; (iv)** the longevity – the **"NJ-BCBS AIF Enterprise"** and the schemes perpetrated through it, have been in existence for over two (2) decades, and are currently **"ongoing"**, as evidenced by the testimony adduced in the trial of Dr. Pompy, and involve other corporate and state related co-conspirators; **(v)** the "**open**" or **"closed ended"** continuity – the scheme and the **"NJ-BCBS AIF Enterprise"** remain "**open ended**" and there continue to remain pending indictments against many other innocent ethnic minority physicians, whose only 'crime' was to practice medicine and operate medical businesses.

42. The activities of the **"NJ-BCBS AIF Enterprise"** affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the commercialization of risk and the investment of fraudulent proceeds into the NYSE, the consequences of which have generated enormous profits.

43. The **"NJ-BCBS AIF Enterprise"** used its common communication network to promote false information that Kaul was not qualified to perform minimally invasive spine surgery, had committed insurance fraud, Medicare fraud and bank fraud and was going to be criminally indicted. The purpose of this propaganda campaign was to isolate Kaul from the medico-legal community and any source of capital, and to dissuade him from pursuing his accounts receivable, in order to deprive him of his right to a legal defense. This permitted the Defendants to improperly profit from a scheme polluted with bribes, fraud, kickbacks, obstruction of justice and perjury.

44. Within the **"NJ-BCBS AIF Enterprise"** the Defendants and their co-conspirators maintain/conduct communication with each other through corporate-state channels, contractual relationships, financial ties, and a continuing coordination of activities. Through this enterprise, the Defendants continue to function as an **"ongoing"** unit with the purpose of furthering their profit purposed ethnic minority physician eradication and cleansing schemes.

45. The Defendants participated in the operation and management of the **"NJ-BCBS AIF Enterprise"** by directing the exchange of information and monies, as described herein. While the Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

46. The Defendants exerted and exert substantial control over the **"NJ-BCBS AIF Enterprise"** and participate in the affairs of the enterprise by: **(a)** deciding how monies were dispersed from the political action committees; **(b)** communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and state/federal investigators and prosecutors; **(c)** developing policies, guidelines and fee schedules for clinical care, in which the Defendants colluded with other insurance corporations to fix the prices paid to physicians; **(d)** procuring appointments to regulatory state agencies, which they abuse to further their corporate economic agendas; **(e)** writing healthcare related legislation; **(f)** funding state/federal administered prosecutions against physicians to whom they owed substantial monies; **(g)** misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Defendant Christie in order to attempt to indict and revoke Kaul's license; **(h)** otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of Kaul from the practice of medicine; **(i)** ensuring that the other unnamed co-conspirators complied with and concealed the fraudulent scheme.

47. Without each of the Defendants and co-conspirators willing participation, the scheme and common course of conduct would not have been successful. The

Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through digital communications.

# Antitrust

**Overview**:

48. In a period commencing in at least, if not before 2005/2006, the Defendants did conspire to commit and did commit a scheme of ongoing per se antitrust violations, in which they continue, in conjunction with other members of the Blue Cross Blue Shield corporations, to further their illegal monopoly of the finite financial 'pool' of the American health insurance industry, not through the provision of a superior service, but through grand schemes of corruption of the executive/legislative/judicial branches of both state and federal government. The Defendants have directed their monopoly power towards the engineering of physician elimination schemes, that are perpetrated, in collusion and conspiracy with the investigative/prosecutorial/adjudicative branches of government, through state and federal courts, that continue to result in the filing of false indictments, convictions and incarcerations. These illegal elimination schemes, the principal targets of which are ethnic minority physicians, are purposed to reduce the competitive threat posed to the market by these physicians. The Defendants false constriction of the market has caused a drastic nationwide physician shortage, and in reducing competition has caused the public a market injury, in that the price of healthcare has arbitrarily risen and its supply declined.

**Relevant Chronological and Contextual Fact**:

49. In February 2005, Kaul revolutionized the field of minimally invasive spine surgery, by inventing and successfully performing the first outpatient minimally invasive spinal fusion, in a same-day surgical center. This event proved that such a surgery could be safely and effectively conducted in an outpatient surgical center by a non-orthopedic/neurosurgical physician with training in interventional pain/minimally invasive spine surgery. This event also presented a market threat to hospitals, insurance companies and the orthopedic-neurosurgical community, who reacted not by attempting to deliver a competitive service based on price/quality, but instead directed their efforts toward corrupting the political/judicial/legislative processes to have their competition eliminated through the introduction of sham anti-competitive legislation and administrative/civil/criminal prosecutions, that resulted in restriction of hospital privileges/license revocations/incarcerations. Kaul was the principal and primary target in this scheme, a scheme in which the Defendants were principal perpetrators, and a scheme orchestrated by Defendant Christie, in collusion and conspiracy with **The Kaul Cases** Defendants.

**Specific Anticompetitive Tactics**:

50. As a consequence of the expansion and increase in competition in the minimally invasive spine surgery market, the Defendants, in collusion and conspiracy with **The**

**Kaul Cases** Defendants, did, in 2011, illegally manipulate the AMA CPT coding system to downgrade the relative value units for endoscopic discectomy, which injured the commercial potential of Kaul's minimally invasive spine surgery practice. The scheme, in which the Defendants played a central role, was concocted by a group of neurosurgeons, that included the then 2011 President of the North American Spine Society, Gregory Przybylski. These individuals, because of their influential positions within their professional societies, had the codes' RVUs reduced with the understanding that the majority of minimally invasive spine surgeons, from interventional pain backgrounds, would be unable to perform open micro-discectomies. The neurosurgeons effectuated the change without publicizing it for comment, thus denying Kaul and other minimally invasive spine surgeons the opportunity to object.

51. These changes lowered the reimbursement rate for endoscopic discectomies, which caused a larger percentage of the insurance health fund to be diverted to the Defendants, who did not share the profit with the public reduced premiums.

52. As a consequence, Kaul sustained substantial losses and damage to his business and property, because of the reduced reimbursement associated with outpatient minimally invasive spine surgery.

53. The Defendants have, through the bribing of politicians, effectuated legislation and regulatory changes that harmed Kaul's minimally invasive spine surgery practice. These included **(i)** a downgrading in the Relative Value Unit associated with the CPT code for endoscopic discectomy **(ii)** the veto of a bill in 2011 by Defendant Christie, that was designed to permit state licensure of one-room surgical centers and **(iii)** the refusal of the Defendants to reimburse surgical centers for minimally invasive spine surgery. These acts artificially and arbitrarily reduced the availability to the public, of outpatient minimally invasive spine surgery.

54. The aforementioned acts constituted in an illegal monopolistic effect on the healthcare premium-based fund element of the minimally invasive spine surgery market, and caused an illegal diversion of monopolistic profits to Defendants, at the expense of, and injury to Kaul and the healthcare premium paying public.

55. The Defendants scheme of non-reimbursement to Kaul and his surgical center for minimally invasive spine surgery, caused him to file suit against the Defendants, who retaliated by scheming with Defendant Christie/NJ state agencies to have Kaul's license revoked, and with the NJ US Attorney/FBI to attempt to have Kaul indicted and incarcerated, as they have done with many other ethnic minority physicians.

56. The Defendants illegal monopolization and availability reduction of the minimally invasive spine market resulted in a rise in opiate consumption as patients' options for pain relief became constricted. Consequently, the Defendants reaped larger profits, at the expense of their clients and the public, and these grossly elevated profits increased Defendants corporate/executive profits, but did not result in a reduction in their clients' premiums, that have in fact continued to rise.

57. The rise in the Defendants profits, since the implementation of the aforesaid changes, is the product of nothing but bribery and legal chicanery.

58. The Defendants illegal per monopolization of the aforementioned market has injured the public by reducing the availability and increasing the price of minimally invasive spine surgery. Corporate greed and malfeasance continue to cause injury to the American public, an injury unabated by the dearth of government prosecutions, a dearth that is a consequence of political corruption, that is itself a consequence of how the political campaign finance system has legalized bribery, in a manner that, incredulously, violates the Foreign Corrupt Practices Act.

59. The Defendants anticompetitive conduct enabled it to indirectly charge consumers and third-party payors, prices in excess of what they would otherwise would have been able to charge, absent their unlawful actions, and excessive prices not related to the provision of a superior service.

60. The Defendants, in their annual applications to the state to increase the cost of healthcare premiums, employed their illegal monopolization of the market, by arguing that the billed cost of minimally invasive spine surgery had increased, itself an improper consequence of the fact that outpatient surgery centers and non-neurosurgical/orthopedic physicians had been illegally eliminated from the market, which permitted hospitals/neurosurgeon-orthopedic surgeons to increase their billed amounts. Thus, in submitting that the average billed amount had increased, the Defendants, in collusion/conspiracy with the state, were permitted to raise, albeit illegally, the cost of premiums, while having substantially reduced service. The end-result is that the public pays more for less, while the Defendants corporate/executive profits continue to rise.

28

# Definition of market

61. From 2000 to 2012, an increasing number of patients chose to have minimally invasive spine surgery performed in outpatient surgical centers by non-neurosurgical/orthopedic physicians, for reasons that included superior clinical service. Hospitals and neurosurgeon-orthopedic groups were unable to compete, and the Defendants perceived this evolution of care as a threat to their corporate/executive profits. Kaul's 0% post-operative infection rate evidenced the superior patient outcomes that were one of the reasons for the clinical and commercial success of his practice and to his knowledge similar outcomes were achieved across the United States by other similarly trained physicians within the outpatient setting. The illegal suspension/revocation in 2012/2014 of Kaul's license caused an anti-trust like injury to the American minimally invasive spine surgery market, which caused it to contract, one consequence of which has been the exponential rise in opiate consumption and heroin use. Patients with spinal injuries, deprived of access to the contracted and more expensive American minimally invasive spine surgery market, have resorted to increased opiate use.

62. The market in which the so called "**Spine Turf Wars**" erupted in approximately 2000 is the American market for minimally invasive spine surgery, which includes the following procedures: 1. Cervical endoscopic discectomy; 2. Thoracic endoscopic discectomy; 3. Lumbar endoscopic discectomy; 4. Anterior cervical discectomy and fusion; 4. Interbody lumbar fusion; 5. Vertebroplasty; 6. Kyphoplasty; 7. Percutaneous pedicle screw placement; 8. Percutaneous facet screw placement; 9. Interspinous distraction; 10. Interspinous fusion; 11. Facet fusion; 12. Sacro-iliac joint fusion; 13. Cervical lateral mass screws; 14. Dorsal column stimulators; 15. Interlaminar decompression.

63. These clinical services are provided to the public to treat degenerative and traumatic spinal conditions that cause pain and functional disability, and are provided by physicians with training in the following areas of medicine and surgery: 1. Interventional pain; 2. Interventional radiology; 3. Neurosurgery; 4. Orthopedics; 5. Physiatry.

64. The locations in which the clinical services can be provided are hospitals and outpatient surgical centers, with the latter being associated with a lower cost and incidence of post-operative infection and complications. The Defendants alleged anti-trust violations, as detailed within, have artificially reduced the availability of minimally invasive spine surgery, and has permitted a substantially greater percentage of the premium healthcare related fund to be illegally diverted to the Defendants, and to hospitals/neurosurgeons, their co-conspirators in the scheme to have Kaul's license revoked, whose ill-gotten profits are derived not from the provision of a superior service, but from having engaged in an antitrust purposed "**pattern of racketeering**," in which they, in collusion/conspiracy with Defendant Christie, converted the State of New Jersey into a **"racketeering enterprise".**

65. The Defendants competed with Kaul for the reservoir of capital derived from the public/patients who purchased health insurance policies, with the understanding that if they required medical care, these monies would fund such care. The Defendants bribed Defendant Christie and other New Jersey legislators to enact laws that either prohibited the provision of minimally invasive spine surgery in outpatient surgical centers or substantially reduced the reimbursements, through the introduction of fee schedules, which effectively prevented surgical centers from providing minimally invasive spine surgery. The fee schedules did not apply to hospitals and discriminated against surgical centers, in which Kaul conducted his procedures.

66. However, the Defendants fee restriction/legislative/sham litigation restricting anticompetitive misconduct escalated into a scheme that caused the administrative/judicial apparatus of the State of New Jersey to be illegally used, in an orchestrated effort by Defendant Christie in collusion/conspiracy with state actors, to have Kaul's license illegally revoked. The state scheme was perpetrated in conjunction with the federal scheme, in which the Defendants conspired with the FBI and the NJ US Attorney's office to attempt, albeit unsuccessful, to indict and incarcerate Kaul on alleged charges of healthcare fraud. Kaul asserts that his case was the first conducted pursuant to the 'playbook' developed as part of the Health Insurance Fraud Partnership (HFPP), a pact entered into in approximately 2012 by the insurance industry and government, in which Indian/African American/Hispanic physicians were targeted for elimination and asset seizure. This scheme, the federal scheme, has since been employed against many innocent ethnic minority physicians in all sectors of healthcare, the majority of whom continue to languish in American jails.

67. Since 2000, the year of emergence of minimally invasive spine surgery, the Defendants have competed within the American minimally invasive spine surgery market, for the revenue associated with the deliverance of these services to afflicted patients and as such, they are deemed to belong to the same "**relevant product/service market**". See U.S. v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct 994, 1007 (1956). See also Queen City Pizza, Inc. v. Domino's Pizza, Inc. 124 F.3d 430, 436 (3rd Cir. 1997) **("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").** The Defendants alleged anti-trust violations, as detailed within, caused an artificial reduction in the supply of services, an artificial rise in price and a reduction in the outer boundaries of the market, due to a reduction in the level of interchangeable services and cross-elasticity of demand.

68. Within the American minimally invasive spine surgery market, the cross elasticity and interchangeability of the services rendered by Kaul and similarly trained physicians, provided the public with the same healthcare based premium service as that from which the Defendants profited through restriction of provision. The Defendants' monopolization of the fund underpinning the provision of minimally invasive spine surgery and their widely publicized and illegal elimination of Kaul, with its intended sentient effects on other non-neurosurgical/orthopedic physicians, caused a per se monopolization of the actual market for this service.

## The Relevant Geographic Market:

69. The relevant geographic market in which Kaul competed with Defendants was the United States. From approximately 2006 onwards Kaul had been referred patients from physicians in almost every other state in the Union, this being partly a consequence of the publicity surrounding his work, and partly a consequence of his superior clinical outcomes. In attracting these patients from other states, Kaul entered into competition with the Defendants for the finite healthcare insurance premium-based fund. The relevant geographic market in this case is the intersectional area from which the public pays healthcare premiums to the Defendants, that are intended to, and should be used to fund the provision of minimally invasive spine surgery. See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (U.S. 1961) ("**the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies**."). Defining the relevant market is a question of fact for the jury unless a party's proposed markets are so unsupported by the evidence or proper antitrust economics that no reasonable jury could properly find in favor of the party on the issue. See Sportservice, Inc. v. Charles O. Finley, 676 F.2d 1291, 1299 (9th Cir., 1982). Also see:

70. Defendant Kaufman: **"That motherfucker Richard Kaul is trying to take over the spine business and we are going to put a stop to it."** K2-(D.E. 2 Page ID 140).

71. Third-Party Witness Anthony Yeung, MD: **"There is a doctor in New Jersey, Richard Kaul, who is performing fusions, but they are going to get him."** (K2-D.E. 53-1 Page ID 1107)

## COUNT TWO
### For Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Defendants' Violations of Sections 1 and 2 of the Sherman Act

72. Plaintiff incorporates by reference the preceding allegations.

73. Defendants knowingly and intentionally engaged in an anticompetitive scheme designed to block the Plaintiff, his surgical center, and similarly trained physicians, from incorporating minimally invasive spine surgery into their outpatient practices. This scheme included, amongst other things (i) obtaining through fraud a downgrading of the relative value unit associated with outpatient endoscopic discectomy; (ii) procuring through bribery the veto of a bill in 2009 by Governor Christie, that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by the Defendants to deny payment to Kaul, similarly trained physicians and outpatient facilities; (iii) the procuring through bribery of the introduction of arbitrarily restricted fees that denied payment for the performance of outpatient minimally invasive spine surgery in free standing surgical centers; (iv) encouraging patients to initiate civil litigation and medical board complaints against Kaul and similarly trained physicians; (v) obtaining through bribery a moratorium in 2009 that prevented the issuance of licenses for one room outpatient surgical centers, unless they were commercially partnered with a hospital; (vi) otherwise engaging in an overarching scheme to unlawfully monopolize, conspire to monopolize, and/or, allocate the market for minimally invasive spine surgery.

74. Defendants conspired to monopolize, and did wrongfully and intentionally maintain monopoly power, with respect to minimally invasive spine surgery in violation of Section 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Kaul and his surgical center were excluded from the minimally invasive spine fusion market, as were similarly trained physicians and the New Jersey surgical center community. By their agreements, Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of this unreasonable restraint on competition, Kaul and his surgical center were excluded from the minimally invasive spine surgery market, as were similarly trained physicians and the New Jersey surgical center community.

### 75. Defendant BCBS + Defendant Marino:

Date range: 2006 to 2016.
Mode of Communications: US mail + E-mail + Voice message + SMS (text) + Face to face.
Substance of communications: Scheme to have Kaul indicted and incarcerated on false charges of healthcare insurance fraud + Scheme to downgrade the relative value unit associated with outpatient endoscopic discectomy + Scheme to bribe Defendant Christie to veto a bill in 2009 that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by Defendant BCBS to deny payment to outpatient facilities and physicians + Scheme to bribe Defendant Christie in

33

order to sign into law in 2011 a fee schedule that denied or reduced payment for the performance of outpatient minimally invasive spine surgery in free standing surgical centers + Scheme to encourage patients to initiate civil litigation and medical board complaints against Kaul and similarly trained physicians + Scheme to obtain through bribing Defendant Christie a moratorium in 2009 that prevented the issuance of licenses for one-room outpatient surgical centers, unless they were commercially partnered with a hospital + Scheme to engage in knowingly unlawful agreements to divide the minimally invasive spine surgery market in such a way, that physicians with similar training as Kaul, would be limited to performing only discectomies, and not fusions + Scheme to engage in an overarching conspiracy to unlawfully monopolize, conspire to monopolize, and/or, artificially allocate the market for minimally invasive spine surgery + Scheme to unlawfully conspire and combine to intentionally and arbitrarily restrict, restrain and or prohibit Kaul's ability to trade in the American minimally invasive spine surgery market + Scheme to restrict, restrain and or exclude Kaul from participating in the American minimally invasive spine surgery market.

Tactics employed: Conspired to, and did bribe Defendant Christie as part of a series of quid pro quo schemes to have Defendant NJBME revoke Kaul's license + Conspired to, and did encourage patients to file lawsuits and complaints with Defendant NJBME against Kaul + Conspired to, and did encourage patients to file complaints with state and federal regulatory/investigative/prosecutorial authorities + Conspired to encourage, and did encourage sham litigation and knowingly false testimony that caused the revocation of Kaul's license + Conspired to encourage, and did encourage sham litigation and knowingly false testimony that caused the entry of false judgments against Kaul in civil malpractice cases + Conspired to encourage, and did encourage sham litigation against Kaul's physician employees, with false testimony that they were not qualified to perform minimally invasive spine surgery and had committed insurance fraud + Conspired to encourage, and did encourage sham litigation against the medical licenses of Kaul's physician employees

Location: Newark offices of Defendant BCBS + Christie/Republican political fund raisers + Office of the New Jersey Governor.


76. Kaul and his surgical center were injured in their business or property by Defendants' antitrust violations. The injury consists of, amongst other things, the deprivation of the ability to incorporate minimally invasive spine surgery into his commercial strategy. Such an injury of **"exclusion"** is of the type antitrust laws were designed to prevent and flows from that which makes Defendants conduct unlawful, and Kaul is the proper entity to bring a case concerning the Defendants misconduct.

77. Kaul continues to suffer and will continue to suffer in the future from being excluded from the minimally invasive spine surgery market, more than he would have absent the Defendants' anticompetitive conduct.

78. Defendants' anticompetitive conduct, pursued in the context of bribery, kickbacks, obstruction of justice, fraud, and falsified legal documents, is absolutely not entitled to

Noerr-Pennington protection, a shield not for those with criminal intent.

79. Kaul, pursuant to Fed. R. Civ. P. 57 and U.S.C. § 2201(a)hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates Sections 1 and 2 of the Sherman Act.

80. Kaul further seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, and other applicable law, to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anticompetitive conduct does not occur in the future.

## COUNT THREE

### For Monopolization of the Minimally Invasive Spine Surgery Market, under state law

81. Plaintiff incorporates by reference the preceding allegations described above.

82. Since at least 1990, the Defendants, in conjunction with neuro-orthopedic spine surgeons and hospitals maintained a monopoly on the spine surgical market. However, in 2005, this monopoly became threatened when Kaul successfully performed the first minimally invasive outpatient lumbar fusion, which allowed patients to be discharged the same day. This case proved that such surgeries could be safely and effectively performed by non-neuro-orthopedic physicians in a same-day surgical center.

83. The Defendants, in seeking to retain their monopoly, retaliated, not by delivering a superior service, but by perpetrating an illegal anticompetitive scheme that involved **"patterns of racketeering"** in the commission of multiple RICO predicate acts, such as bribery, fraud, evidential falsification, false arrest, false imprisonment, judicial corruption and public corruption. The Defendants engaged in a quid pro quo scheme with Defendant Christie, in which he received bribes, disguised as 'campaign donations' in return for having the medical board revoke Kaul's medical license, and initiate state/federal criminal investigations, in order to attempt to have Kaul indicted and incarcerated. In addition, the Defendants misconduct caused the economic collapse of six medium sized corporations, and the commencement of Chapter 11 proceedings on June 17, 2013, and several medical emergencies that threatened Kaul's life.

84. The Defendants knowingly and intentionally engaged in an anticompetitive scheme to monopolize the minimally invasive spine surgery market. The Defendants accomplished this scheme by, amongst other things, encouraging patients to file lawsuits against the Plaintiff, and filing complaints against the Plaintiff, with state and federal investigative/prosecutorial/regulatory authorities.

85. The substance of the Defendants communications, and their tactics in furtherance of their anticompetitive scheme, as relevant this Count, are the same as those perpetrated and pled in Count 6

86. The goal, purpose and effect of the Defendants' scheme was to prevent Kaul and similarly trained physicians from increasing the availability of outpatient minimally invasive spine surgery, and from increasing the number of physicians able to provide the service. The Defendants illegal scheme allowed them to divert a greater percentage of the public's health insurance premiums into corporate/executive compensation, thus reaping substantial unlawful monopoly profits, while reducing the availability of the service to patients with spinal pain/disability.

87. The Defendants knowingly and intentionally encouraged sham litigation against Kaul, that included encouraging patients to file lawsuits and complaints with the medical board, and then encouraged fraudulent 'expert' testimony in the subsequent legal proceedings, in which Kaul was repeatedly, and fraudulently, accused of not being qualified to perform minimally invasive spine surgery. The Defendants re-repeated and publicly disseminated the false allegations that Kaul had deviated from the standard of care because he did not possess hospital or alternative privileges. The Defendants re-repeated and publicly disseminated the false allegations that Kaul had deviated from the standard of care because his training did not involve a neurosurgical residency. These claims were false and designed to protect and further the monopoly held by the Defendants on the fund underpinning the minimally invasive spine surgery market. The Defendants aided and abetted these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep Kaul and similarly trained physicians out of the minimally invasive spine surgery market.

88. The Defendants knowingly and intentionally aided and abetted sham litigation that resulted in the revocation of Kaul's medical license. The Defendants encouraged the provision of knowingly false testimony that Kaul had deviated from a supposed standard of care for minimally invasive spine surgery. The Defendants aided and abetted these falsehoods in multiple courts and in the public domain for the purpose of protecting their monopoly on minimally invasive spine surgery. The knowingly false testimony encouraged by the Defendants during the licensing proceedings, fabricated a basis for to revoke Kaul's license. The revocation caused the collapse of six medium sized corporations, the loss of jobs, the loss of tax revenue, the loss of healthcare to hundreds of patients with no insurance, which forced a number of these patients to seek pain relief through street grade heroin. The Defendants co-opted Kaul's patients into their monopolistic scheme, by encouraging them to provide false testimony in the legal proceedings that caused the illegal revocation of Kaul's license.

89. The goal, purpose and effect of the Defendant's scheme was to prevent Kaul, his surgical center and those of similarly trained physicians from continuing to provide outpatient minimally invasive spine surgery. This restricted the availability of the service to permitted them to illegally reduce competition and divert a greater percentage of the public's healthcare related premiums into corporate/executive profit. The Defendants knew that Kaul had, in 2009, obtained one of the last surgical center licenses issued by the state, and had plans to develop a thirty-six thousand (36,000) square foot, four (4) operating room, multi-disciplinary surgical center, that was to provide the template for a national, and then global expansion program in minimally invasive spine surgery.

90. The goal, purpose and effect of the Defendants schemes were to maintain and extend their monopoly power in minimally invasive spine surgery. The Defendants illegal scheme permitted them to continue diverting a greater percentage of the public's

healthcare related premiums into corporate/executive profit This harmed the public by reducing the availability of the service, caused injury to Kaul's economic standing and permitted the Defendants to reap substantial unlawful monopoly profits.

91. The Defendants knowingly, intentionally and with malice aforethought aided and abetted sham litigation against Kaul's physician employees. The Defendants fraudulently asserted that the employees were not qualified to assist Kaul in the performance of minimally invasive spine surgery, and that they had engaged in insurance fraud. The purpose of the sham litigation was to manufacture an excuse to not pay Kaul for the minimally invasive spine surgery services he had provided to the Defendants' clients. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anti-competitive weapon to exclude Kaul's employees and similarly trained physicians from the minimally invasive spine surgery market.

92. The Defendants also knowingly, intentionally and with malice aforethought engaged in sham litigation against Kaul's employees' medical licenses, initiating medical board investigations that were intended to ostracize Kaul from his professional colleagues, the purpose of which was to force Kaul to leave the country, and forego the opportunity to seek legal redress. The Defendants abused governmental process to extend their monopoly power.

93. As a result of Defendants' illegal conduct, Kaul and his physician employees were excluded from the minimally invasive spine surgery market and were compelled to incur substantial legal fees in the defense of the sham board investigations. But for the Defendants' illegal conduct and consequent revocation, Kaul would have continued to expand his scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care.

94. Had Kaul not been targeted by the Defendants, he would have continued to legitimately expand his scope of practice in minimally invasive spine surgery, and lawfully compete with the Defendants within the finite healthcare premium funded and professional elements of the minimally invasive spine surgery market and the public would not have been denied the benefits of competition.

95. By engaging in the within detailed felonies and specifically the bribing of persons associated with the investigative/prosecutorial/adjudicative elements of state/government, the Defendants have knowingly and with malice aforethought violated the following state antitrust laws; and have intentionally and wrongfully maintained monopoly power in the relevant market in violation of antitrust law the

following states with respect to the availability of minimally invasive spine surgery, in the knowledge that Kaul had plans to expand nationally: (i) Arizona Rev. Stat. §§ 44-1401, et seq; (ii) Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq; (iii) D.C. Code Ann. §§ 28-45031, et seq; (iv) Fla. Stat. §§ 501. Part II et seq; (v) Kan. Stat Ann. §§ 50-101 et seq; (vi) Me. Rev. Stat. Ann. 10, § 1101, et seq; (vii) Mich. Comp. Laws Ann. §§ 445.771, et seq; (viii) Minn. Stat. §§ 325D.52, et seq; (ix) Miss. Code Ann. §§ 59-801, et seq; (x) Neb. Code Ann. §§598A, et seq; (xi) Nev. Ret. Stat. Ann. § 598A, et seq; (xii) N.M. Stat. Ann. §§ 57-1-1, et seq; (xiii) New York General Business Law § 340, et seq; (xiv) N.C. Gen. Stat. §§ 75-1, et seq; (xv) N.D. Cent. Code § 51-08.1-01, et seq; (xvi) Or. Rev. Stat. §§ 646.705, et seq; (xvii) S.D. Codified Laws Ann. § 37-1, et seq; (xviii) S.D. Codified Laws Ann. § 37-1, et seq; (xix) S.D. Codified Laws Ann. § 37-1, et seq; (xx) Tenn. Code Ann. §§ 47-25-101, et seq; (xxi) Utah Code Ann. §§ 76-10-911, et seq; (xxii) Vt. Stat. Ann. 9, § 2453, et seq; (xxiii) W.Va. Code §§ 47-18-1, et seq; (xxiv) Wis Stat. § 133.01, et seq

96. Kaul has been injured, and continues to be injured in his business and property by Defendants' anti-trust violations. The injuries consist of: (1) the illegal revocation of Kaul's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care; (2) exclusion of Kaul from the minimally invasive spine surgery market, from which the Defendants have illegally, and continue to illegally profit; (3) the loss into bankruptcy of Kaul's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license and real estate; (4) the loss of Kaul's professional reputation developed over thirty (30) years. These injuries are of the nature for which the antitrust laws of the above States and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## COUNT FOUR
### For Conspiracy to Monopolize under State Law

97. Plaintiff incorporates by reference the preceding allegations

98. As previously pled, and up until March 2005, the Defendants co-controlled monopoly power in the market for traditional inpatient 'open' spine surgery. This changed in March 2005 when Kaul performed the first minimally invasive outpatient spinal fusion, which caused the Defendants to willfully commence conspiring to extend their monopoly power to the outpatient minimally invasive spine surgery market. To achieve this goal, they perpetrated, in collusion/conspiracy with state actors/agencies, a knowingly illegal anticompetitive scheme to exclude Kaul and similarly trained physicians from incorporating minimally invasive spine surgery into their practices, and not as a result of providing a superior service, legitimate business acumen or historical accident.

99. The Defendants knowingly and intentionally conspired to monopolize the minimally invasive spine surgery market, through a scheme that involved: **(i)** obtaining through fraud a downgrading of the relative value unit associated with outpatient endoscopic discectomy, **(ii)** procuring through bribery the veto of a bill that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by the Defendant Insurance Carriers to deny payment to physicians and one operating room outpatient facilities, **(iii)** procuring through bribery the introduction of a fee schedule in 2011 that denied payment for the performance of outpatient minimally invasive spine surgery, **(iv)** encouraging patients to initiate civil litigation and medical board complaints against the Plaintiff and similarly trained physicians, **(v)** obtaining through bribery a moratorium in 2009 that prevented the issuance of licenses for free standing outpatient surgical centers, unless they were commercially partnered with a hospital, **(vi)** Defendant Neurosurgeons unlawfully agreeing with representatives of Defendant ASIPP that the market for minimally invasive spine surgery would only be divided in a way, that physicians such as the Plaintiff would be limited to performing only discectomies and not fusions, and **(vii)** otherwise engaging in an overarching scheme to unlawfully monopolize, conspire to monopolize, and allocate the market for minimally invasive spine surgery.

100. The substance of the Defendants communications, and their tactics in furtherance of their anticompetitive scheme, as relevant this Count, are the same as those perpetrated and pled in Count 2

101. The goal, purpose and effect of the Defendants' scheme was to extend its monopoly power to include minimally invasive spine surgery market. Defendants' illegal scheme allowed them to divert a greater percentage of the public's premium related healthcare fund to

corporate/executive profit due simply to the illegal suppression of competition. This allowed the Defendants to reap substantial unlawful monopoly profits.

102. The agreements between the Defendants and their neurosurgical-hospital co-conspirators are overt acts between separate economic entities-actual and potential competitors-and are illegal per se under state antitrust laws. The agreements made between the Defendants and their neurosurgical-hospital co-conspirators were that payment for minimally invasive spine surgery, would be limited to cases performed in hospitals or their attached surgical centers, and not to independently owned surgical centers. The Defendants co-conspirators conspired not to credential minimally invasive spine surgeons, such as Kaul, for minimally invasive spine surgery. The effect of these agreements was to arbitrarily exclude Kaul and his surgical center from participating minimally invasive spine surgery market. Thus, the Defendants illegally profited at the expense of Kaul and other independent surgical centers, that incurred substantial losses, which caused a severe contraction in the number of surgical centers in New Jersey, and a reduction of availability of service to the public, that persists to this day.

103. Alternatively, Kaul alleges that the agreements and conspiracy to monopolize are a violation of state antitrust law under a **"quick look"** or **"rule of reason"** analysis. The Defendants knowingly and intentionally aided and abetted sham litigation against Kaul that included encouraging patients to file lawsuits and complaints with the medical board, and then encouraging fraudulent testimony from so called 'experts' and patients in legal proceedings with the medical board/administrative courts. The Defendants repeatedly and fraudulently re-asserted that Kaul was not qualified to perform minimally invasive spine surgery. The Defendants repeatedly and fraudulently re-asserted that Kaul had deviated from a supposed standard of care because he did not possess hospital or alternative privileges. The Defendants repeatedly and fraudulently re-asserted that Kaul had deviated from the standard of care because his training did not involve a neurosurgical residency. These claims were false and designed to further the Defendants monopoly to include minimally invasive spine surgery, a scheme that has constricted, and continues to constrict the availability of the service to the public's detriment. The Defendants perpetrated their knowingly illegal anticompetitive scheme, in collusion/conspiracy with the NJ state government, and NJ based federal agencies, over which Defendant Christie had exerted control.

104. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out of the minimally invasive spine surgery market.

105. In furtherance of the scheme to monopolize the minimally invasive spine surgery market, the Defendants encouraged and aided/abetted massive schemes of evidential falsification, fraud, perjury and judicial corruption in the NJ administrative proceedings (April 9 to June 28, 2013), that caused the illegal revocation of Kaul's license IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, M.D. TO PRACTICE MEDICINE AND

41

SURGERY IN NEW JERSEY (April 9, 2013, to June 28, 2013).

106. The Defendants perpetrated the knowing fraud of the revocation in a coordinated campaign that commenced on December 13, 2013, and continues today, with a global dissemination of this falsehood across the US and international wires to healthcare/regulatory related agencies, including the DEA, Medicare, the FBI, the OIG and all state medical boards and associated entities, the purpose being to attempt to continue the illegal elimination of Kaul from medicine, in the belief that it will prevent Kaul from exposing the Defendants and **The Kaul Cases** Defendants decades-plus-long criminal enterprise. In April 2012, one of Kaul's lawyers, shocked at the never-before witnessed intensity and level of attack from NJ state/NJ federal agencies/persons, communicated to Kaul his belief that Kaul was being attacked as if he were **"public enemy number one"**. The Defendants, in keeping with their 'mafia-like' tactics of racketeering and per se antitrust violations, wanted to ensure an absolute elimination of Kaul, be it through professional/reputational destruction, incarceration, suicide and or death.

107. The Defendants, in collusion and conspiracy with **The Kaul Cases** Defendants both aided and abetted and facilitated the filing and wide publicization of knowingly fraudulent claims against Kaul that he was not qualified to perform minimally invasive spine surgery. These falsehoods were purposed to permit the Defendants and their co-conspirators to monopolize not only the healthcare premium related fund, but the professional procedural aspect of the minimally invasive spine surgery market

108. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep Kaul and similarly trained physicians out of the minimally invasive spine surgery market. The Defendants and their state/federal co-conspirators coopted Kaul's patients into their scheme, and 'coached' them to provide perjurious testimony, with the promise that if Kaul's license was revoked, they would be guaranteed money from a malpractice claim, despite knowing that the illegality of the revocation would render any revocation-based claim/judgment a fraud on the court.

109. The Defendants criminal-state-of-mind, and the facilitation of their felonies by state agencies/persons became subsequently exposed in USA v Pompy, and constitutes conclusive evidence of not just a **"vast conspiracy"**, but a long-standing **"open ended pattern of racketeering"** that is being conducted by the Defendants through the investigative/prosecutorial/adjudicative elements of American state/federal governments, with the assistance of the US corporate media. This grand scheme of never-before witnessed corruption, has caused mass incarceration of innocent Indian/African America/Hispanic and other ethnic minority physicians, and many physicians who delivered care in poverty-stricken areas, in which the public's healthcare related net balance to the insurance industry is negative, and the elimination of these physicians causes the eradication of these net negative patient units.

110. The goal, purpose, and effect of the Defendants' scheme, in collusion/conspiracy with **The Kaul Cases** Defendants, was to maintain and extend monopoly power with respect to the

minimally invasive spine surgery market, and to prevent Kaul and similarly trained physicians from continuing to provide outpatient minimally invasive spine surgery. This restricted availability and suppressed competition, entirely consequent to their illegal scheme, permitted Defendants BCBS/Marino to artificially raise the cost of their premiums with the argument that because neuro-ortho surgeons were now the only providers within the minimally invasive spine surgery market, albeit through illegal tactics, they had raised their prices, and so Defendants BCBS/Marino had to raise their annual premiums to continue to provide the service to their clients, In this conspiratorial way, the Defendants further reaped illegal anticompetitive profits.

111. The effect of this scheme was purely anticompetitive in that it artificially and detrimentally reduced to the public, the availability of lifesaving/changing minimally invasive spine surgery, while simultaneously and artificially raising the cost to those that could still afford the service, in the form of increased provider/hospital fees and increased annual premiums with larger co-pays. This scheme (2006-2020) permitted the Defendants and **The Kaul Cases** Defendants to reap substantial unlawful monopoly profits, and represents a prototypical-like variation of the illegal scheme (2016-2023) perpetrated against Dr. Pompy, but an illegal scheme that was a massive public failure, in that Dr. Pompy was acquitted by a jury on all thirty-nine (39) counts. The trial caused the emergence of **"new evidence"**, previously unknown or knowable to Kaul, of the Defendants state-sponsored systemic **"pattern of racketeering"** within the investigative/prosecutorial/adjudicative arms of American state/federal governments.

112. The Defendants, in seeking to ostracize Kaul, did aid/abet and encourage the filing by state agencies/actors of knowingly illegal sham litigation against the medical licenses of Kaul's physician associates. The initiation of these fraudulent medical board investigations was purposed to isolate Kaul from his professional colleagues, in the belief that he would leave the country, and forego the opportunity to seek legal redress and have exposed the Defendants crimes, ones in which they abused governmental process to extend their monopoly to the premium related healthcare fund underpinning minimally invasive spine surgery. The exposition of the Defendants long-standing **"open ended pattern"** of ongoing criminal conduct occurred in the trial of Dr. Pompy.

113. As a direct consequence of the Defendants knowingly illegal anticompetitive per violations, Kaul and his physician associates were artificially excluded from the minimally invasive spine surgery market, were caused to incur substantial legal fees in their defense of sham legal proceedings, and would, but for the Defendants wrongdoing, have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care. The public was denied the benefits of competition, as became evident from testimony adduced from the patients caused to become abandoned by the BCBS family Defendants' mafia-like conspiracy related indictment of Dr. Pompy. The related legal cases of Drs. Lesly Pompy and Neil Anand, constitute and contain further conclusive evidence of the claims Kaul has asserted since February 22, 2016, the filing date of K1, the first of **The Kaul Cases**.

114. The Defendants anticompetitive scheme, perpetrated in collusion/conspiracy with **The Kaul Cases** Defendants, increased their monopoly of the minimally invasive spine surgery market, the deleterious consequences to the public of which have been a reduction in the availability of services, an artificial elevation of healthcare premium price, reduced competition, and a reduction in the rate of innovation. The last ten (10) years have witnessed a decrease in the development of new spinal techniques, with the majority of innovations originating outside the United States. These are the exact problems for which the antitrust laws were designed, and for which the Defendants' violations are responsible. The reduced availability of service contributed to the opiate epidemic.

115. The Defendants, in conjunction with other members of the insurance industry and with the aiding/abetting of state/federal investigative/prosecutorial/adjudicative agencies/persons have engineered a system of totalitarian-esque tyrannical bureaucratic oppression, whose only purpose is the generation of profit through the usury-like exploitation of the public and slave-like manipulation of physicians, forced to work under the ever-looming threat of incarceration, if they dare to practice medicine and bill the insurance industry. This **"pattern"** of human exploitation commenced in the 1600s with the insurance industry's critical involvement in and profiteering from the trans-Atlantic slaving industry. The slave plantations initially moved from the fields to the jails, but are now evident in American corporate healthcare, where the principal concern is the maximal exploitation of patients/physicians in the furtherance of corporate/executive profit.

116. By engaging in the within detailed felonies and specifically the bribing of persons associated with the investigative/prosecutorial/adjudicative elements of state/government, the Defendants have knowingly and with malice aforethought violated the following state antitrust laws; and have intentionally and wrongfully maintained monopoly power in the relevant market in violation of antitrust law the following states with respect to the availability of minimally invasive spine surgery, in the knowledge that Kaul had plans to expand nationally: (i) Arizona Rev. Stat. §§ 44-1401, et seq; (ii) Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq; (iii) D.C. Code Ann. §§ 28-45031, et seq; (iv) Fla. Stat. §§ 501. Part II et seq; (v) Kan. Stat Ann. §§ 50-101 et seq; (vi) Me. Rev. Stat. Ann. 10, § 1101, et seq; (vii) Mich. Comp. Laws Ann. §§ 445.771, et seq; (viii) Minn. Stat. §§ 325D.52, et seq; (ix) Miss. Code Ann. §§ 59-801, et seq; (x) Neb. Code Ann. §§598A, et seq; (xi) Nev. Ret. Stat. Ann. § 598A, et seq; (xii) N.M. Stat. Ann. §§ 57-1-1, et seq; (xiii) New York General Business Law § 340, et seq; (xiv) N.C. Gen. Stat. §§ 75-1, et seq; (xv) N.D. Cent. Code § 51-08.1-01, et seq; (xvi) Or. Rev. Stat. §§ 646.705, et seq; (xvii) S.D. Codified Laws Ann. § 37-1, et seq; (xviii) S.D. Codified Laws Ann. § 37-1, et seq; (xix) S.D. Codified Laws Ann. § 37-1, et seq; (xx) Tenn. Code Ann. §§ 47-25-101, et seq; (xxi) Utah Code Ann. §§ 76-10-911, et seq; (xxii) Vt. Stat. Ann. 9, § 2453, et seq; (xxiii) W.Va. Code §§ 47-18-1, et seq; (xxiv) Wis Stat. § 133.01, et seq

117. Kaul has been, and continues to be injured in his business and property by reason of Defendants' anti-trust violations, as alleged in this claim. The injuries consist of: **(1)** the illegal revocation of Kaul's New Jersey medical license and the loss to his patients of their ability to

receive minimally invasive spine care and, **(2)** exclusion of Kaul and other similarly trained physicians from the minimally invasive spine surgery market which has caused an increase in the Defendants monopolization of the premium related healthcare find and **(3)** the loss into bankruptcy of Kaul's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and **(4)** loss of Kaul's professional reputation developed over thirty years. These injuries are the type for which the antitrust laws of the above States and the District of Columbia were designed to prevent, and are injuries that flow from the Defendants misconduct, and which make the Defendants' misconduct unlawful.

## COUNT FIVE
### For Conspiracy and Combination in Restraint of Trade Under State Law

118. Plaintiff incorporates by reference the preceding allegations.

119. The Defendants willfully and unlawfully engaged in a continuing illegal contract, combination, and conspiracy to restrain trade in the minimally invasive spine surgery market, by engaging in an anticompetitive scheme to exclude Kaul and similarly trained physicians from the market, and to allocate the market funds between horizontal competitors.

120. Defendants BCBS/Marino aided, abetted, and encouraged the commission of a massive scheme of fraud and judicial corruption within the 2013 NJ administrative proceedings that caused the illegal revocation of Kaul's medical license. Specifically, and as was their **"pattern"** in USA v Pompy, they conspired with state agencies/actors including **The Kaul Cases** Defendant, Christie, to commit two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission and gross mischaracterization IN THE MATTER OF THE SUSPENSION OR REVOCATION THE LICENSE OF RICHARD A. KAUL TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY (April 9, 2013 to June 28, 2013), in the knowledge that **The Kaul Cases** Defendant Solomon's fraudulent Final Opinion (issued December 13, 2013) would cause the revocation of Kaul's license, eliminate him from the practice of medicine, eradicate their debt, eliminate the threat of future billing submissions and have a chilling sentinel effect on other similarly trained physicians and outpatient surgical centers, an effect that did illegally increase corporate/executive profit, at the expense of the public and medical profession.

121. In a period commencing in approximately 2006 the Defendants, as evidenced by internal memorandum obtained through FOI requests, began conspiring to develop a policy whereby they schemed to target the most successful ethnic minority physicians, for license revocation and incarceration, in order to intimidate the medical community into not submitting professional fee invoices to Defendant BCBS. In 2006, Defendant Christie was part of a such a scheme, when he, in his capacity as the US Attorney for the District of New Jersey, indicted/convicted/incarcerated multiple Indian cardiologists whose patient populations were covered by Defendant BCBS.

122. The agreements between the Defendants were/are horizontal market allocation and price fixing agreements between actual or potential competitors and are illegal per se under state antitrust laws. Defendants BCBS conspired with **The Kaul Cases** hospital/neuro-ortho surgeons Defendants to restrict payment for minimally invasive spine surgery to neuro-ortho surgeons, hospitals, and or surgical centers owned by hospitals. This contract constituted an illegal horizontal market allocation agreement.

123. The substance of the Defendants communications, and their tactics in furtherance of their anticompetitive scheme, as relevant this Count, are the same as those perpetrated and pled in Count 2

124. Alternatively, Kaul alleges that these agreements are an unreasonable restraint of trade, in violation of state antitrust law, under a **"quick look"** or **"rule of reason"** analysis. The consequence of these improper agreements was the exclusion from the minimally invasive spine fusion market of Kaul and his surgical center, with regards to treating patients who possessed insurance issued by Defendant BCBS.

125. The Defendants aided, abetted, and facilitated sham litigation against Kaul that included encouraging Kaul's patients to file lawsuits and complaints with the medical board, and encouraging Kaul's physician competitors to provide fraudulent 'expert' testimony for the patients and the medical board. The Defendants repeatedly and fraudulently asserted that Kaul was not qualified to perform minimally invasive spine surgery, that he had deviated from the standard of care because he did not possess hospital or alternative privileges and that he had deviated from the standard of care because his training did not involve a neurosurgical residency. The Defendants knew these claims were false and were designed to further their monopoly of the minimally invasive spine surgery related healthcare fund. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep Kaul and similarly trained physicians out of the minimally invasive spine surgery market.

126. **The Kaul Cases** Defendant Solomon played a pivotal role in the perpetration of the Defendants' illegal schemes to have Kaul's license revoked. Solomon, having received bribes from Defendant BCBS/others, committed and conspired to commit obstruction of justice and evidence tampering in the administrative board proceeding (April 9 to June 28, 2013). Solomon aided and abetted perjury and other acts of official malfeasance, and in doing so, he converted his bench, and the New Jersey Office of Administrative Law, into a racketeering enterprise that has illegally deprived Kaul of his trade and livelihood for over a decade.

127. The goal, purpose and effect of the Defendant's scheme was to prevent Kaul, his surgical center and those of similarly trained physicians from continuing to provide outpatient minimally invasive spine surgery, and thus restrict the availability of the service to **The Kaul Cases** neuro-ortho surgeons and hospital Defendants, which has permitted, in the absence of competition, an artificial price elevation, which Defendants BCBS/Marino used, with knowingly falsity, to improperly raise the public's annual healthcare premiums. This scheme of illegal profiteering caused a reduction in availability of minimally invasive spine surgery and an increase in corporate/executive profit, a scheme in which the Defendants exploited and continue to exploit the public/medical profession.

128. The Defendants knowingly and intentionally engaged in sham litigation against Kaul's physician associates, and repeatedly and fraudulently asserted that they were not qualified to assist Kaul in the performance of minimally invasive spine surgery, and that Kaul had engaged in insurance fraud.

129. The Defendants knowingly and intentionally engaged in sham litigation against Kaul's physician employees, initiated medical board investigations that sought to ostracize Kaul from his professional colleagues, and to force Kaul to leave the country and relinquish the opportunity to seek legal redress. The Defendants abused governmental process to extend their monopoly.

130. As a consequence of Defendants' illegal conduct, Kaul and his physician employees were excluded from the minimally invasive spine surgery market and were compelled to incur substantial legal fees in the defense of the sham board investigations. Had it not been for the Defendants' illegal conduct, Kaul and his employees would have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care. The Defendants' decade-plus-long campaign of financial misconduct contributed to the opiate epidemic in New Jersey.

131. Had Kaul and similarly trained physicians been allowed to continue expanding their scope of practice in minimally invasive spine surgery, and lawfully compete with the Defendants, then the public would not have been denied the benefits of competition.

132. By engaging in the within detailed felonies and specifically the bribing of persons associated with the investigative/prosecutorial/adjudicative elements of state/government, the Defendants have knowingly and with malice aforethought violated the following state antitrust laws; and have intentionally and wrongfully maintained monopoly power in the relevant market in violation of antitrust law the following states with respect to the availability of minimally invasive spine surgery, in the knowledge that Kaul had plans to expand nationally: (i) Arizona Rev. Stat. §§ 44-1401, et seq., (ii) Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq; (iii) D.C. Code Ann. §§ 28-45031, et seq; (iv) Fla. Stat. §§ 501. Part II et seq; (v) Kan. Stat Ann. §§ 50-101 et seq; (vi) Me. Rev. Stat. Ann. 10, § 1101, et seq; (vii) Mich. Comp. Laws Ann. §§ 445.771, et seq; (viii) Minn. Stat. §§ 325D.52, et seq; (ix) Miss. Code Ann. §§ 59-801, et seq; (x) Neb. Code Ann. §§598A, et seq; (xi) Nev. Ret. Stat. Ann. § 598A, et seq; (xii) N.M. Stat. Ann. §§ 57-1-1, et seq; (xiii) New York General Business Law § 340, et seq; (xiv) N.C. Gen. Stat. §§ 75-1, et seq; (xv) N.D. Cent. Code § 51-08.1-01, et seq; (xvi) Or. Rev. Stat. §§ 646.705, et seq; (xvii) S.D. Codified Laws Ann. § 37-1, et seq; (xviii) S.D. Codified Laws Ann. § 37-1, et seq; (xix) S.D. Codified Laws Ann. § 37-1, et seq; (xx) Tenn. Code Ann. §§ 47-25-101, et seq; (xxi) Utah Code Ann. §§ 76-10-911, et seq; (xxii) Vt. Stat. Ann. 9, § 2453, et seq; (xxiii) W.Va. Code §§ 47-18-1, et seq; (xxiv) Wis Stat. § 133.01, et seq

133. Kaul has been, and continues to be injured in his business and property by reason of Defendants' anti-trust violations, as alleged in this claim. The injuries consist of: **(1)** the illegal revocation of Kaul's New Jersey medical license and the loss to his patients of their ability to

receive minimally invasive spine care and, **(2)** exclusion of Kaul and other similarly trained physicians from the minimally invasive spine surgery market which has caused an increase in the Defendants monopolization of the premium related healthcare find and **(3)** the loss into bankruptcy of Kaul's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and **(4)** loss of Kaul's professional reputation developed over thirty years. These injuries are the type for which the antitrust laws of the above States and the District of Columbia were designed to prevent, and are injuries that flow from the Defendants misconduct, and which make the Defendants' misconduct unlawful.

134. Plaintiff seeks damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

## COUNT SIX
### For Unfair and Deceptive Trade Practices Under State Law

135. Plaintiff incorporates by reference the preceding allegations.

136. Defendants engaged in unfair competition or unfair, unconscionable, deceptive, and or fraudulent acts or practices in violation of the state consumer protection statutes.

137. As a direct and proximate result of the Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Kaul was prevented from nationally developing his outpatient minimally invasive spine surgery business because the market had been illegally monopolized by Defendant BCBS and their neuro-ortho surgeon/hospital co-conspirators. Kaul, a recognized innovator in the field, commenced training other minimally invasive spine surgeons in approximately 2007, and had plans to develop a fellowship and standards, that would have increased the number of minimally invasive surgeons in the national market. The Defendants' racketeering and illegal anticompetitive conduct derailed Kaul's plans for economic and educational expansion. The Defendants' illegal suppression of competition has restricted the public's access to minimally invasive spine surgery, has caused a reduction in innovation, an elevation in price and contributed to the opiate epidemic.

138. The illegal revocation of Kaul's license was disseminated over the US wires to every state medical board and was widely publicized on the Internet with stories that commenced in April 2012 and whose effects persist to this day. These events have caused permanent/irreparable damage to Kaul's reputation and caused the regulatory agencies and public in all states to be deceived by the Defendants' fraudulent and anticompetitive scheme against Kaul.

139. The substance of the Defendants communications, and their tactics in furtherance of their anticompetitive scheme, as relevant this Count, are the same as those perpetrated and pled in Count 2

140. By engaging in the within detailed felonies and specifically the bribing of persons associated with the investigative/prosecutorial/adjudicative elements of state/government, the Defendants have knowingly and with malice aforethought violated the following state antitrust laws; and have intentionally and wrongfully maintained monopoly power in the relevant market in violation of antitrust law the following states with respect to the availability of minimally invasive spine surgery, in the knowledge that Kaul had plans to expand nationally: (i) Arizona Rev. Stat. §§ 44-1401, et seq; (ii) Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq; (iii) D.C. Code Ann. §§ 28-45031, et seq; (iv) Fla. Stat. §§ 501. Part II et seq; (v) Kan. Stat Ann. §§ 50-101 et seq; (vi) Me. Rev. Stat. Ann. 10, § 1101, et seq; (vii) Mich. Comp. Laws Ann. §§ 445.771, et seq; (viii) Minn. Stat. §§ 325D.52, et seq; (ix) Miss. Code Ann. §§ 59-801, et seq; (x) Neb. Code Ann. §§598A, et seq; (xi) Nev. Ret. Stat. Ann. § 598A, et seq; (xii) N.M. Stat. Ann. §§ 57-1-1, et seq; (xiii) New York General Business Law § 340, et seq; (xiv) N.C. Gen. Stat. §§ 75-1, et seq; (xv) N.D. Cent. Code § 51-08.1-01, et seq; (xvi) Or. Rev. Stat. §§ 646.705, et seq; (xvii)

S.D. Codified Laws Ann. § 37-1, et seq; (xviii) S.D. Codified Laws Ann. § 37-1, et seq; (xix) S.D. Codified Laws Ann. § 37-1, et seq; (xx) Tenn. Code Ann. §§ 47-25-101, et seq; (xxi) Utah Code Ann. §§ 76-10-911, et seq; (xxii) Vt. Stat. Ann. 9, § 2453, et seq; (xxiii) W.Va. Code §§ 47-18-1, et seq; (xxiv) Wis Stat. § 133.01, et seq

141. Kaul has been, and continues to be injured in his business and property by reason of Defendants' anti-trust violations, as alleged in this claim. The injuries consist of: **(1)** the illegal revocation of Kaul's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, **(2)** exclusion of Kaul and other similarly trained physicians from the minimally invasive spine surgery market which has caused an increase in the Defendants monopolization of the premium related healthcare find and **(3)** the loss into bankruptcy of Kaul's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and **(4)** loss of Kaul's professional reputation developed over thirty years. These injuries are the type for which the antitrust laws of the above States and the District of Columbia were designed to prevent, and are injuries that flow from the Defendants misconduct, and which make the Defendants' misconduct unlawful.

142. Kaul seeks damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

## COUNT SEVEN
### Unjust enrichment

143. Plaintiff incorporates by reference the preceding allegations.

144. The Defendants have benefited from the monopoly profits on the increased revenues that have flowed from the illegal elimination of the competition presented by Kaul and similarly trained physicians.

145. The Defendants unjust profits result from their unlawful and inequitable conduct that facilitated a falsely substantiated increase in the public's healthcare insurance premiums, consequent to the elimination of the competition presented by Kaul and similarly trained physicians. The Defendants misconduct conferred on them an economic benefit attributable to monopoly profits and a benefit to the economic detriment of Kaul and similarly trained physicians. It would be futile for Kaul to seek a remedy from any party with whom they had privity of contract. Defendants have paid no *legal* consideration to anyone for any benefits received indirectly from Kaul. Defendants engaged in the bribing of public officials in furtherance of their illegal anticompetitive scheme.

146. The substance of the Defendants communications, and their tactics in furtherance of their anticompetitive scheme, as relevant this Count, are the same as those perpetrated and pled in Count 2

147. The profits that flowed, and continue to flow to the Defendants from their illegal scheme rightfully belong to Kaul, because the monies were illegally diverted from the revenues consequent to the provision of minimally invasive spine surgery to patients, and monies that should have been paid to Kaul, and would have been paid to Kaul if he had continued to perform minimally invasive spine surgery.

148. It is inequitable under the laws of all states and jurisdictions within the United States for the Defendants to be permitted to retain, to the grave detriment and continued expense of Kaul, any of these illegally procured profits that are derived from their unfair and unconscionable methods, acts and trade practices, as are alleged in this Complaint. Defendants should be compelled to disgorge in a common fund for the benefit of Kaul all unlawful or inequitable proceeds received by them.

149. The Defendants conspired with **The Kaul Cases** Defendant, and counsel for the bankruptcy trustee to defraud Kaul and the creditors of his estate, by willfully failing to collect monies owed to Kaul by Defendant BCBS for the provision of interventional pain and minimally invasive spine surgery.

150. The Defendants procured monies through fraud and deceit at the expense of Kaul, his corporations, and the majority of his creditors
A constructive trust should be imposed upon all unlawful or inequitable sums received

52

by Defendants traceable to Kaul.

## COUNT EIGHT
### Deprivation of Right pursuant to Defendants violation
### of Section 1981/1983

151. Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth.

152. The Defendants aided, abetted, and encouraged a deprivation of Kaul's human/constitutional right to due process by: (i) on December 13, 2013, causing to be published, in collusion/conspiracy with **The Kaul Cases** Defendant, Solomon, a knowingly false opinion that furthered the scheme to illegally revoke Kaul's license; (ii) encouraging the commission of two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission and gross mischaracterization in the administrative law proceeding (April 9 – June 28, 2013), that resulted in the revocation of Kaul's license; (iii) encouraging the medical board to refuse to have conducted an independent analysis and comparison of the state authored transcripts, the independent transcripts, the court audio recordings, and Defendant Solomon's Final Opinion; (iv) encouraging the medical board to not respond to Kaul's written pleas for an investigation of the tampered evidence and witness perjury; (v) encouraging the medical board to refuse to acknowledge its corrupted partiality in adjudicating Kaul's complaint of evidence tampering, in knowing violation of Kaul's Fourteenth Amendment right to an impartial tribunal. The Defendants facilitated this act with malicious and reckless disregard for Kaul's due process rights, in the knowledge that Kaul had, on June 7, 2012, requested that the Mercer County Court appoint a special prosecutor and ad hoc medical board. The latter request was submitted as a consequence of **The Kaul Cases** Defendant, and then NJ AG, Jeffrey Chiesa's prejudicial comments to the media on May 9, 2012, and the illegal suspension of Kaul's CDS prescribing license on May 22, 2012, by AG Chiesa's subordinate, and acting director of the Division of Consumer Affairs, Eric Kanefsky, Esq; (vi) encouraging the medical board to not exclude **The Kaul Cases** Defendant, and then deputy AG Doreen Hafner from any involvement in Kaul's application for license reinstatement in 2014, on the basis that Kaul had filed an ethics complaint against Hafner, in September 2013; (vii) encouraging the medical board to not suspend the reinstatement application, until Hafner had recused herself from the matter. Hafner's personal animus towards Kaul, and her personal relationship with **The Kaul Cases** Defendant Andrew Kaufman, violated Kaul's right to an impartial tribunal. This violation was magnified by the unconstitutional configuration of the mechanism of physician regulation.

152. The Defendants aided, abetted, and facilitated the commission of fraud and perjury in legal proceedings conducted in administrative/state/bankruptcy/federal courts within the geographic boundaries of the State of New Jersey, in a period that commenced in at least 2010 and continued into 2021.

153. The Defendants knew that Kaul was qualified, credentialed, and licensed to

perform minimally invasive spine surgery. The Defendants caused their co-conspirator public officials to abuse their positions of public authority to mislead the public into believing their lies about Kaul, and thus violated, and continue to violate Kaul's human and constitutional right to life, liberty and property and due process.

154. The Defendants aided, abetted, and encouraged a conspiracy to commit a knowingly false interpretation of the alternative privileges regulation, that was used by **The Kaul Cases** Defendant, Solomon, as one of the knowingly false bases to revoke Kaul's license.

155. The Defendants knew the regulation was not required for the performance of minimally invasive spine surgery, and in fact, during the administrative proceedings, when **The Kaul Cases** Defendant Hafner was unable to articulate an argument in support of her contention, her co-conspirator, **The Kaul Cases** Defendant Solomon interjected with his own corrupt interpretation.  The Defendants committed and conspired to commit a knowingly dishonest interpretation of the rights afforded to Kaul by his plenary medical license that permitted him to practice both **medicine and SURGERY.**

156. The Defendants committed and conspired to commit a concealment of the truth of the clinical effectiveness of Kaul's minimally invasive spine surgery practice, by encouraging the medical board to refuse with fraudulent intent, Kaul's suggestion to have his practice independently analyzed and monitored.

157. The substance of the Defendants communications, and their tactics in furtherance of their anticompetitive scheme, as relevant this Count, are the same as those perpetrated and pled in Count 2

158. The Defendants are **"persons"** under 42 U.S.C. § 1981 and have funded and continue to fund the NJ Office of the Insurance Fraud Prosecutor, the Office of the NJ Attorney, with whom they share a common and private non-state server. The Defendants drafted and continue to draft healthcare legislation for the state, a function that is governmental in nature, and for which the law prohibits the involvement of non-governmental entities.

159. In 2009, the Seventh Circuit summarized the US Supreme Court's criteria, to determine whether the actions of private parties constituted governmental functions. The tests were (i) the symbiotic relationship test (Burton v Wilmington Parking Suth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed2d 45 (1961), (ii) the state command and encouragement test (Moose Lodge No. 107, 407 U.S. at 176-77, 92 S.Ct (1965), (iii) the joint participation doctrine (Lugar v Edmonton Oil Co., 1982), (iv) the public function test (Jackson v Metro Edison Co., 419 U.S. 345, 353 95 S.Ct 449, 42 L.Ed2d 477 (1974).

160. The State Actor Tests that confirm that although this claim is filed pursuant to section 1981, the Defendants do possess section 1983 **"person"** status pursuant to the

(i) symbiotic test, (ii) joint participation doctrine, (iii) state command and encouragement test, (iv) public function test, (v) pervasive entwinement.

161. State action is found when a private corporation or actor provides a **"public function"** i.e., the drafting of healthcare legislation, as in Marsh v Alabama, 326 U.S. 501 (1946). See also Terry v Adams 345 U.S. 461 (1953); Evans v Newton, 382 U.S. 296 (1966) **("That is to say, when private individuals or groups are endowed by the State with powers or function governmental in nature, they become agencies or instrumentalities of the State and subject to Constitutional limitations.")**. State action is found when the private corporation is heavily regulated by the state i.e., the Department of Banking and Insurance, thereby giving the state control of the corporations' acts.

162. Defendant BCBS, if further evidence of its 'state actor' status was required under a section 1983 claim, has engaged, and continues to engage in the conception, construction and perpetration of state/federal criminal investigations and prosecutions ostensibly 'spearheaded' by the NJ Division of the FBI/US Attorney and the NJ Office of the Insurance Fraud Prosecutor. The latter avenue to incarceration of innocent physicians to whom Defendant BCBS owes money is disguised as a civil matter, in order to deceive parties into believing that they do not need to take the usual legal precautions, associated with criminal investigations.

163. Lawyers for Defendant BCBS in assisting in the co-drafting of **The Kaul Cases** Defendant Solomon's Final Opinion, issued on December 13, 2013, did conduct a state function, and in doing so did adopt 'state actor' status for Kaul's purpose of claiming a violation of his civil rights, under both sections 1983 and 1981.

164. Alternatively under section 1981 or section 1983, the Defendants abused their 'state actor' position to advance their private commercial interests, at the expense of Kaul's Constitutional right to due process, in that amongst other things, they, in collusion/conspiracy with **The Kaul Cases** Defendants public officials (Christie/Hafner/Chiesa/Kanefsky/Solomon/Kaufman/Przybylski/NJBME/Lomazow) aided, abetted and facilitated the commission of two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission, and mischaracterization in the MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, M.D. TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY (April 9, 2013, to June 28, 2013).

165. The Defendants conspired with **The Kaul Cases** Defendant Solomon to issue a fraudulent opinion (December 13, 2013) regarding the administrative proceeding that caused the revocation of Kaul's license, an opinion that contains two hundred and

seventy-eight (278) separate acts of perjury and evidential omissions, misrepresentations, and gross mischaracterizations, and an opinion published on a document that was transmitted, and continues to be transmitted, with knowing fraudulence across the US wires.

166. The Defendants abused the power of their public function for personal gain, in the knowledge that they competed with Kaul for the public's healthcare premium related fund, in which the Defendants only function, under the law and as per their contracts with Kaul's patients, was that of premium collection. However, the Defendants, as with many other such entities in the insurance industry, developed schemes to illegally divert an unauthorized percentage of these monies into corporate/executive profits and private investment funds, and in furtherance of these schemes perpetrated grand schemes of political and judicial corruption in an attempt to insulate themselves from prosecution for amongst other things, theft, and embezzlement.

167. The Defendants, in seeking to violate Kaul's right to due process, but in wanting to ensure that they wrongful conduct and long-standing conspiracy with public agencies/officials was concealed by the ostensible acts of public officials, and in wanting to particularly mitigate against section 1983 claims, aided, abetted, and facilitated the fraudulent testimony of **The Kaul Cases** Defendants Przybylski/Kaufman in the administrative proceedings (April 9 to June 28, 2013). Specifically, and as evidenced by 'The Solomon Critique' and 'The Solomon Critique 2', there were committed two hundred and seventy-eight (278) separate acts of perjury and evidential omissions, misrepresentations, and gross mischaracterizations.

168. Within **The Kaul Cases**, Kaul exposed the architecture and function of these state-corporate schemes of political/judicial/legislative corruption, but the evidence adduced in USA v Pompy and Anand v Independence BCBS has unequivocally un-buttressed and undermined this now shaky edifice of 21st century American corporate greed and corruption.

## COUNT NINE
### Commercial disparagement

169. Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth.

170. Commencing in approximately 2005/2006, the Defendants knowingly and with malice commenced perpetrating anticompetitive purposed schemes of defamation and derogation, in which they used the US wires and face-to-face interactions to propagate false statements to Kaul's patients (e.g., Richard Barbetta), referring physicians, medical device suppliers and lawyers that Kaul was not qualified to perform minimally invasive spine surgery.

171. As a consequence of these schemes, the Defendants illegally diverted an un-contractually supported greater percentage of the public's healthcare premiums into corporate/executive profit and unauthorized investment vehicles, the profits of which were not translated into the reduced healthcare premiums, but were instead funneled into to the Defendants trusts/accounts and into their schemes of political/judicial corruption, to reduce, by cooption, the threat of criminal prosecution.

172. The Defendants false statements were intended to cause financial damage to Kaul and his business and did in fact cause, and continue to cause immense harm to Kaul's reputation and business, for which the Defendants are directly liable, as the Defendants knew that Kaul was qualified to perform minimally invasive spine surgery but nonetheless acted with a malicious disregard of its truth.

173. The Defendants encouraged patients to file lawsuits against Kaul, and criticized Kaul's work, the purpose of which was to attack Kaul's reputation and economic standing, and to have Kaul's medical license revoked.

174. The substance of the Defendants communications, and their tactics in furtherance of their anticompetitive scheme, as relevant this Count, are the same as those perpetrated and pled in Count 6

175. The Defendants' wrongful acts caused immense and permanent harm to the Plaintiff's economic standing and reputation.

## COUNT TEN
### Intentional Interference with prospective economic advantage

176. Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth herein.

177. In approximately 2005/2006, the Defendants commenced filing complaints against Kaul with the medical board, the purpose of which was to eliminate him from the minimally invasive spine surgery market, in order to increase their share of the public's healthcare premium related fund. As a consequence of these complaints, the medical board conducted a hearing before a preliminary evaluation committee in 2006 regarding Kaul's practice of minimally invasive spine surgery, and took no action, nor required Kaul to limit his practice nor take a neurosurgical/orthopedic residency.

178. In this same time period, the Defendants, in concert with **The Kaul Cases** Defendants commenced encouraging Kaul's patients to file lawsuits and complaints with the medical board against Kaul, in furtherance of their scheme to have Kaul's license revoked and to cause him to leave the United States, as was incorrectly predicted by a member of the office of the NJ attorney general, who in April 2012, commented to one of Kaul's lawyers: **"He [Kaul] is probably going to pack his bags and leave"**

179. In this same time period, the Defendants in collusion/conspiracy with **The Kaul Cases** neuro-ortho surgeons/hospital Defendants encouraged spine device representatives to cease supplying Kaul and his surgical center with the devices he required to perform minimally invasive spine surgery.

180. From 2005 to 2012 the Defendants encouraged physicians in their network to not to refer patients to Kaul and slandered Kaul's reputation by stating, amongst other things, that he was not qualified to perform minimally invasive spine surgery.

181. Commencing in approximately 2005, the Defendants met with Defendant Christie and other New Jersey politicians on multiple occasions, during which they planned their schemes to not only have have Kaul's license revoked, but those of other ethnic minority physicians to whom they owed money. By 2005, the Defendants were perpetrating this scheme of revocation/incarceration across the country in multiple states, with a particular focus on successful ethnic minority physicians in New Jersey, California, Pennsylvania, and Michigan. The January 4, 2023, acquittal of Dr. Lesly

Pompy exposed the inner machinations of the scheme, and caused Dr. Neil Anand to seek an injunction against the BCBS family, from any further perpetration of this scheme (**Exhibit 11**)

182. The substance of the Defendants communications, and their tactics in furtherance of their anticompetitive scheme, as relevant this Count, are the same as those perpetrated and pled in Count 2.

183. The Defendant's aforesaid actions constituted knowing, intentional and voluntary interference with Kaul's minimally invasive spine surgery practice.

184. The Defendant's aforesaid actions constituted negligent interference with Kaul's minimally invasive spine surgery practice and caused the illegal revocation of Kaul's license in 2014.

185. The Defendant actions constitute unjustified and wrongful interference with Kaul's minimally invasive spine surgery, and a reasonable expectation of economic advantage as aforesaid. The Defendants wrongful interference did not rest upon a legitimate interest or have a legitimate purpose, and was fraudulently perpetrated in collusion/conspiracy with investigative/prosecutorial/adjudicative agencies and persons associated with the state/federal governments, that sought to eliminate Kaul from the relevant market, through license revocation/reputational destruction/incarceration/suicide/death, in order to ensure he was prevented/dissuaded from seeking legal redress and exposing the truth of the Defendants long-standing criminal state-corporate "**pattern**" of human rights violations.

187. As a result of the Defendants' actions, the Defendants are liable for the permanent damages caused by their interference with Kaul's life/liberty/livelihood/career/reputation/property, in both a retroactive and prospective manner.

188. Kaul had a reasonable expectation of economic advantage or benefit flowing from the revenues of not just his minimally invasive spine surgery practice in New Jersey, but from his planned expansion across the United States, and globally, of this service and others, such as intellectual property development and education. The calculated damages are identified in the 'Settlement Terms' filed in K1 on February 22, 2016.

189. The Defendants knew or should have known of the expectancy of the aforesaid economic advantage of Kaul's New Jersey minimally invasive spine surgery practice and its attendant expansion.

190. In the absence of the Defendant's wrongful acts as foresaid, it is highly likely, based on Kaul's immensely successful commercial history in the period from 2005 to 2012, that he would have actualized its aforesaid economic advantage or benefit with respect

to his ongoing NJ minimally invasive spine surgery practice and its attendant national/global expansion.

191. As a result of the Defendant's aforesaid wrongful acts, Kaul has suffered, and continues to suffer immense and permanent damage to his life/liberty/livelihood/career/reputation/property, and recognizing the American courts have thus far denied him access to justice, he is moving in the Indian Courts against American corporations and the State of New Jersey. Kaul is not the only Indian physician pursuing this international course of action (**Exhibit 11**).

## COUNT ELEVEN
### Violation of Kaul's due process rights pursuant to the Excessive Fines Clause of the Eight Amendment and due process Clause of the Fourteenth Amendment

192. The Defendants, in furtherance of their state-corporate scheme, did aid, abet, and encourage **The Kaul Cases** Defendant, New Jersey Medical Board to, on March 12, 2014, enter a knowingly illegal order that not only unlawfully revoked Kaul's license to practice medicine and surgery in New Jersey, but fined Kaul over $475,000. The Defendants were motivated to have such an illegal 'fine' entered, that further violated Kaul's fundamental human/constitutional rights, as they wanted to eliminate Kaul, and attempt to render impossible his return, in order to stymie his right to legal redress and his exposition of their criminal scheme.

193. The Defendants efforts failed, in that there has emerged in USA v Pompy and Anand v Independence BCBS highly incriminating **"new"** evidence of their state sponsored **"pattern of racketeering"**, evidence that corroborates the claims asserted in **The Kaul Cases**, and directly implicates the Defendants in the same crimes, and evidence that only recently came into Kaul's possession.

194. On February 28, 2019, the United States Supreme Court in Timbs v. Indiana,586 U.S. 139 S.Ct. 682; 203 L.Ed. 2d 11 held that the State of Indiana, in confiscating a car worth no more than $42,000 from an individual convicted of drug dealing, had violated his constitutional rights.

195.  Defendants conspired with **The Kaul Cases** Defendant, New Jersey Board of Medical Examiners, to use the illegal fine of $475,000 to obstruct Kaul's application for reinstatement of his medical license, denying him the right to even present his case for reinstatement, until he had paid the knowingly illegal fine. The purpose of such an obstruction was the Defendants motivation to eliminate Kaul, and attempt to render impossible his return, in order to stymie his right to legal redress and his exposition of their criminal scheme.

196. In early 2019, Kaul submitted another application to **The Kaul Cases** Defendant NJBME in order to obtain his license in New Jersey. The application, with a money order for $325.00 was delivered to the offices of Defendant NJBME by Fedex in mid-March. In late May, Kaul was informed by an employee of Defendant NJBME, that his application had not been processed because it had to be submitted online through a website administered by Defendant NJBME. Kaul attempted on several occasions to initiate the process, but after having submitted his name, the website prevented him from filing his application. Kaul contacted the employee ("Maisha") at Defendant NJBME and explained that his online application had been blocked. Kaul was routed through to another employee, who communicated to Kaul that he would have to talk with an individual by the name of **"Jacqueline Johnson"** in order to ascertain what steps were required of him to submit his application.

197. The Defendants, for the above stated reasons, not only continued to conspire with NJBME to obstruct Kaul's efforts to have returned the illegally seized property of his license, but continue to the present in the perpetration of this scheme, in a manner that violates Kaul's right to his life/liberty/property/livelihood/reputation.

198. From late May 2019 to late 2021, Kaul has continued to attempt to have his NJ license reinstated, and the Defendants, Kaul now asserts in light of the **"new evidence"** have continued to obstruct his efforts, in order to attempt to eliminate Kaul, and to render impossible his return, in order to stymie his right to legal redress and his exposition of their criminal scheme.

## COUNT TWELVE
## Aid in the Commission of Tort

199. The Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs and incorporates same as if set forth fully herein

200. The Defendants pursued a common plan or design to commit a series of torts upon Kaul, through their active participation, encouragement, or ratification of the harm committed, and continuing to be committed against Kaul.

201. The Defendant common plan is also causing a grave and ongoing detriment to the public, whose access to lifesaving minimally invasive spine surgery remains illegally restricted, while the Defendants profiteering continues unabated with increased profits from fraudulently procured raised healthcare premiums, and illegal diversion of premium related healthcare funds into corporate/executive profits and unauthorized investment funds. The self-serving insurance industry 'fox' cannot be permitted to remain in charge of the 'henhouse' of the lives and health of the American people, and this case, along with USA v Pompy and Anand v Independence BCBS establish the factual/legal basis on which to place the lives of Americans, before the greed and profits of corporations/executives, such as Defendants BCBS and Marino.

202. The Defendants are jointly and severally liable to Kaul for his damages suffered as a consequence of all of the aforementioned torts, claims and counts.

## Demand for Judgment

**WHEREFORE,** Kaul seeks judgment against the Defendants jointly and severally, as follows:

1. Compensatory + Consequential + Punitive Damages.

2. Declaring that the revocation of the Plaintiff's medical license was procured through illegal means and was an illegal act.

3. Declaring that the conduct alleged herein is in violation of Sections 1 and 2 of the Sherman Act, of the other statutes set forth above, and of the common law of unjust enrichment under the laws of all states and jurisdictions within the United States.

4. Enjoining Defendants from continuing the illegal activities alleged herein.

5. Granting Kaul equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment.

6. Awarding Kaul treble, multiple, punitive and/or other damages.

7. Awarding Kaul the costs of suit, including reasonable attorneys' fees as provided by law.

8. Granting such other relief as is necessary to correct for the anti-competitive effects caused by the unlawful conduct of Defendants, and as the Court deems just.

## Jury Demand

Plaintiff demands trial by jury on all issues so triable.

## Demand for Insurance

Demand is hereby made for all insurance policies, which may cover the damages alleged in this Complaint.

I certify that the above statements are true and accurate to the best of my knowledge, and that if it is proved that I willfully and knowingly misrepresented the facts, then I am subject to punishment.

Respectfully submitted on this 27th day of 2023

By: _____

Richard Arjun Kaul, MD